# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
### *Southern Division*

ROBERT ROTHMAN, et. al.,

        Plaintiffs,

    -against-

DANIEL SNYDER,

        Defendant.

**FILED UNDER SEAL**

Case No. PJM-20-3290

## DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

**INTRODUCTION**..................................................................................................... 1

I.  FACTUAL BACKGROUND ........................................................................... 3

    A.  The Parties ........................................................................................... 3

    B.  Plaintiffs Improperly Attempt to Sell Their Interest In WFI ...................... 4

    C.  Mr. Schar Orchestrates A Public Smear Campaign To Threaten And Extort Mr. Snyder ........................................................................... 4

    D.  Plaintiffs Acted In Concert ....................................................................... 7

    E.  Their Extortionate Scheme Having Failed, Plaintiffs Seek A Third-Party Sale ........................................................................... 8

    F.  The Stockholders Agreement Requirements On Notice Of Intention To Sell and Right of First Refusal ............................................ 10

    G.  Deficiencies With The Plaintiffs' Notice .................................................. 10

    H.  Mr. Snyder Asked The Arbitral Tribunal To Resolve The Parties Dispute With Regard To The Plaintiffs' Notice ...................................... 12

II.  LEGAL STANDARD.................................................................................... 14

III.  ARGUMENT ................................................................................................ 15

    A.  This Court Is Not The Proper Forum For This Dispute ........................... 15

    B.  Plaintiffs Are Unlikely To Succeed On The Merits.................................. 19

        i.  Mr. Snyder's Exercised Right Of First Refusal Was Timely And Appropriate ████████████ ............................... 20

        ii.  Plaintiffs' Cannot Hide Behind Their Deficient Notice ......................... 22

    C.  There Is No Irreparable Injury Here For Plaintiffs ............................... 24

    D.  Mr. Snyder Will Be Substantially Harmed If Injunctive Relief Is Granted ........ 26

    E.  The Balance Of Equities Favors Denying Plaintiff's Request For Injunctive Relief ........................................................................... 28

    F.  The Public Interest Will Not Be Served By Granting Injunctive Relief............. 30

IV.  CONCLUSION ............................................................................................ 30

# TABLE OF AUTHORITIES

PAGES(S)

**CASES**

*Annapolis Professional Firefighters Local 1926, IAFF v. City of Annapolis*,
100 Md. App. 714 (1994) ................................................................................ 24-25

*Bethesda Softworks, LLC v. Interplay Entm't Corp.*,
452 F. App'x 351 (4th Cir. 2011) ......................................................................... 26

*Capital Grp. Cos. v. Armour*,
2005 WL 678564 (Del. Ch. Mar. 15, 2005).......................................................... 28

*Capitol Payment Sys., Inc. v. Di Donato*,
2017 WL 2242678 (D. Md. May 23, 2017) ........................................................... 19

*Giant Brands, Inc. v. Giant Eagle, Inc.*,
228 F. Supp. 2d 646 (D. Md. 2002) ....................................................................... 28

*Greenville Hosp. Sys. v. Employee Welfare Ben. Plan for Employees of
Hazelhurst Mgmt. Co.*,
628 F. App'x 842 (4th Cir. 2015)........................................................................... 15

*Hicks v. Gilbert*,
135 Md.App. 394, 400 A.2d 986 (2000) ................................................................ 29

*Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*,
174 F.3d 411 (4th Cir. 1999) ................................................................................ 20

*In re Shawe & Elting LLC*,
2015 WL 4874733 (Del. Ch. Aug. 13, 2015), *aff'd sub nom. Shawe v. Elting*,
157 A.3d 152 (Del. 2017) ..................................................................................... 27

*Jacobson v. Ronsdorf*,
2005 WL 29881 (Del. Ch. Jan. 6, 2005), *aff'd*, 906 A.2d 807 (Del. 2006) ........... 27

*Kansas City S. v. Grupo TMM, S.A.*,
2003 WL 22659332 (Del. Ch. Nov. 4, 2003) ....................................................... 26

*Leaders of a Beautiful Struggle v. Baltimore Police Dep't*,
2020 WL 6500931 (4th Cir. Nov. 5, 2020)............................................................ 15

*Maages Auditorium v. Prince George's Cty., Md.*,
 4 F. Supp. 3d 752, 760 (D. Md. 2014) ..................................................................14

*Mona v. Mona Elec. Grp., Inc.*,
 176 Md. App. 672 (2007) ......................................................................................29

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
 460 U.S. 1 (1983)...................................................................................................29

*Ocean Petroleum, Co. v. Yanek*,
 416 Md. 74 (2010) .................................................................................................20

*ODS Techs., L.P. v. Marshall*,
 832 A.2d 1254 (Del. Ch. 2003)..............................................................................23

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*,
 923 F. Supp. 2d 745 (D. Md. 2013) .......................................................................22

*Pisgah Labs, Inc. v. Pharmaforce, Inc.*,
 No. CIV. 1:05CV334, 2005 WL 3116584 (W.D.N.C. Nov. 22, 2005) ..................16

*Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*,
 324 U.S. 806 (1945) ..............................................................................................29

*RCM LS II, LLC v. Lincoln Circle Assocs., LLC*,
 2014 WL 3706618 (Del. Ch. July 28, 2014)..........................................................22

*Salt Lake Tribune Publ. Co. v. AT&T*,
 320 F.3d 1081 (10th Cir. 2003)..............................................................................28

*Schade v. Maryland State Bd. of Elections*,
 401 Md. 1 ...............................................................................................................24

*T. Rowe Price Recovery Fund, L.P. v. Rubin*,
 770 A.2d 536 (Del. Ch. 2000).................................................................................27

*Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*,
 408 Md. 700 (2009) ...............................................................................................28

*Ticor Title Ins. Co. v. Cohen*,
 173 F.3d 63 (2d Cir. 1999)......................................................................................26

*URS Corp. v. Maryland-Nat'l Capital Park & Planning Comm'n*,
 2018 WL 3323194 (Md. Ct. Spec. App. July 6, 2018) ...........................................21

*USACafes v. Office*,
 1985 WL 44685 (Del. Ch. Oct. 28, 1985) ..............................................................27

**OTHER AUTHORITIES**

Will Hobson and Liz Clarke, *From dream job to nightmare: More than a dozen women allege sexual harassment and verbal abuse by former team employees at Redskins Park*, WASH. POST (July 16, 2020), https://www.washingtonpost.com/sports/2020/07/16/redskins-sexual-harassment-larry-michael-alex-santos/ .................................................................................5

Jason Wolf, "Titans, NFL still at odds over ownership structure," THE TENNESSEAN (Feb. 1, 2017 5:43 PM), https://www.tennessean.com/story/sports/nfl/titans/2017/02/01/titans-nfl-still-odds-over-ownership-structure/97367504 .................................................................................29

# INTRODUCTION

Defendant Daniel M. Snyder opposes the emergency relief sought by Plaintiffs in this forum.[1] Robert Rothman, Frederick W. Smith, and Dwight C. Schar (collectively, "Plaintiffs") improperly filed this action on November 13, 2020, alleging breach of contract, and seeking a permanent injunction and other equitable relief preventing Mr. Snyder from exercising his contractually bargained-for right of first refusal ("Motion for TRO and PI"). Specifically, Plaintiffs seek a ruling on the merits of their claim that their October 23, 2020 Notice of Intention to Sell (the "Notice") their interests in Washington Football, Inc. ("WFI") complied with the requirements of the WFI Second Amended and Restated Shareholders Agreement dated March 31, 2005 (the "Stockholders Agreement"), and effectively precluded Mr. Snyder from ████████ ████████████████████████████████████████████████████

On June 26, 2020, Plaintiffs commenced a confidential arbitration against Mr. Snyder alleging various violations of the Stockholders Agreement (the "Arbitration"). ████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████ Thereafter, Defendant counterclaimed against Plaintiffs ████████ ████████████████████████████████████████████████████ Now, in a seeming about face and transparent attempt to forum shop, Plaintiffs seek this Court's audience to restrain unreasonably Mr. Snyder's rights and enjoin the arbitral tribunal from determining the merits of this dispute.

First and foremost, this Court is not the proper forum for this dispute because the Court

---

[1] Mr. Snyder files concurrently herewith Defendant's Response to Plaintiffs' Emergency Motion for Protective Order, and Defendant's Memorandum of Reasoning and Authorities in Response to Plaintiffs' Emergency Motion for Protective Order, both dated November 17, 2020.

lacks jurisdiction over claims that are subject to binding arbitration under the terms of the Stockholders Agreement and under the exclusive jurisdiction of the NFL Commissioner under the NFL Constitution and Bylaws. In this action, Plaintiffs allege that Mr. Snyder breached Section 7 of the Stockholders Agreement, and also seek a permanent injunction prohibiting him from exercising his right of first refusal.

Second, setting aside the Court's lack of jurisdiction, Plaintiffs also do not satisfy the requirements supporting the issuance of a temporary restraining order ("TRO") or preliminary injunction ("PI"). Not only are Plaintiffs not entitled to a TRO or PI because this Court is not the proper forum for the relief sought, but Plaintiffs improperly seek declaratory relief as to Mr. Snyder's ability to exercise his right of first refusal, which is final relief on the merits and not the proper subject of a motion for a TRO or PI. Plaintiffs also will not suffer irreparable harm if this Court does not grant the sought-after relief, whereas Mr. Snyder will be substantially harmed if the Court grants Plaintiffs' request: Granting an injunction would not only eviscerate and deprive Mr. Snyder of his unique, bargained-for contractual right of first refusal to purchase WFI shares, but would also ███████████████████████████████████████████, which would impact substantially the Snyder family's ownership interest in the franchise. The balance of equities clearly favors Mr. Snyder, because Plaintiffs face no material risk of harm should this Court deny the TRO and PI and instead permit the arbitral tribunal to determine the merits of the issues presented to this Court. Indeed, the ████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ Plaintiffs also should not be rewarded for orchestrating and fueling a vicious misinformation campaign against Mr. Snyder,

2

and now improperly seeking relief in this forum. And last, an injunction here does not serve the public interest. Plaintiffs requested relief flies in the face of the strong federal policy favoring arbitration, and contradicts Plaintiffs' own prior actions ███████████████ in the Arbitration. To be sure, granting Plaintiffs a TRO and PI where the language of the Stockholders Agreement is unambiguous and clear as to the proper forum for the claims alleged in this action and as to the rights and responsibilities of the Parties would cast doubt on the integrity of contractual agreements in the NFL and beyond.

## I. FACTUAL BACKGROUND[2]

### A. The Parties

Mr. Snyder purchased the Washington Football Club franchise in 1999 with unanimous approval from the NFL. In connection with his purchase, on April 12, 1999, Mr. Snyder formed Washington Football, Inc., a Maryland corporation ("WFI") and became its first Chairman, President, and Chief Executive Officer. Minority shareholders Robert Rothman, Dwight C. Schar and Fredrick W. Smith became stockholders of WFI on August 22, 2003, upon the exit of original stockholder Mortimer Zuckerman. The Stockholders Agreement was entered into on March 31, 2005, when Mr. Rothman and Mr. Schar increased their ownership percentage by purchasing additional non-voting interests in WFI from exiting stockholder Fred Drasner. Ex. 1.[3] At present,

---

[2] References to "Exhibits" or "Ex." herein refer to the exhibits attached the Declaration of Andrew Levander, dated November 17, 2020.

[3] Attached as Exhibit 1 to the Levander Declaration is a fully executed version of the Stockholders Agreement. Exhibit 1 to the Declaration of Julia Beskin in Support of Plaintiffs' Emergency Motion attaches an unsigned draft of the Stockholders Agreement that includes two sections labelled Section 14, see Beskin Decl., Ex. 1 at 25-26, but aside from the numbering difference appears to be substantially the same as Exhibit 1 to the Levander Declaration on substantive provisions at issue in this action. Mr. Snyder interprets Plaintiffs' incorrect citations to the sections after Section 14 as citing the appropriate references found in the operative Stockholders Agreement.

Mr. Snyder is the Principal Owner and sole Voting Shareholder of WFI, owning 40.459% of its shares; his mother Arlette Snyder owns 6.489% of the non-voting Shares; his sister Michele Snyder owns 12.552% of the non-voting Shares; Mr. Rothman owns 15.168% of the non-voting Shares, Mr. Smith owns 10.163% of the non-voting Shares, and Mr. Schar owns 15.168% of the non-voting Shares.

**B.  Plaintiffs Improperly Attempt to Sell Their Interest In WFI**

Beginning in approximately May 2020, Plaintiffs embarked on a campaign to force Mr. Snyder either to sell WFI as a whole or to buy out the Plaintiffs for far in excess of the fair market value of their non-marketable, minority interest in WFI. ██████████████████ ██████████████████████████████████████████████ Ex. 2. When Mr. Snyder refused to accede to the Plaintiffs' demands, a campaign commenced to disparage Mr. Snyder and his family in an effort to extort a handsome ransom for the Plaintiffs' interests in WFI.

**C.  Mr. Schar Orchestrates A Public Smear Campaign To Threaten And Extort Mr. Snyder**

On June 26, 2020, Plaintiffs instituted the confidential Arbitration against Mr. Snyder ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ expressly acknowledging that under the NFL Dispute Resolution Guidelines ("NFL Dispute Resolution Guidelines"), such interim relief was well within the authority of the arbitral tribunal, not the federal courts. Shortly thereafter, Mr. Schar initiated contact with Mary Ellen Blair, a former WFI employee, and enlisted her assistance in a public smear campaign designed to disparage, harass and intimidate Mr. Snyder.

Mr. Schar called Ms. Blair on July 5, 2020, and they spoke numerous times that day and dozens of times over the next two months. *See* Ex. 3. Ms. Blair's phone records confirm that Mr. Schar called her on July 5, 2020, and she and Mr. Schar spoke nine times that day. *Id.* at MEB000105R–106R. Indeed, for the next 45 days, she and Mr. Schar spoke at least 63 times, *id.* at MEB000105R–138R, and 149 times in July and September 2020. Ex. 4.

Ms. Blair contemporaneously described her conversations with Mr. Schar, and the minority owner's scheme, in text messages to third parties. For example, in a July 5, 2020, text message to Bobby Potter, Ms. Blair explained: "Well one of the minority owners called me today and told me they all want out and when they asked dan for financials he would not turn them over and kicked them off the board so they are now about to wage a legal war on Dan Snyder and want the NFL to force a sale." Ex. 5 at MEB-001105. "Dwight Schar owns the building i live in so we are friends and he called me today to let me know whats going on." *Id.* at MEB-001106. Ms. Blair further stated that Mr. Schar "wants to be total behind the scenes." *Id.* at MEB-001099.

Mr. Schar expressly asked Ms. Blair to leak information to *The Washington Post*, and she happily complied. In a text message to Liz Clarke, a reporter at *The Washington Post*, on July 5, 2020, Ms. Blair wrote "Call me ASAP. Mr. Schar just called me great news for u call me ASAP please." Ex. 6 at MEB-000597. The information that Mr. Schar asked her to leak included alleged incidents of sexual harassment at WFI as well as disparaging and extortionate information about Mr. Snyder.

*The Washington Post* published information Ms. Blair was able to feed them, with the first article being published on July 16, 2020. *See, e.g., From dream job to nightmare: More than a dozen women allege sexual harassment and verbal abuse by former team employees at Redskins Park*, WASH. POST (July 16, 2020), https://www.washingtonpost.com/sports/2020/07/16/redskins-

sexual-harassment-larry-michael-alex-santos/. In follow up text messages with friends and colleagues after the article was published, Ms. Blair admitted that the facts in the media were "a lie"[4] but "[t]he idea is to force Snyder to sell." Ex. 7 at MEB-000288.

At the same time, Mr. Smith attempted to add to the pressure on Mr. Snyder by causing Federal Express to leak to *The New York Times* and *The Washington Post* the details of a letter to WFI threatening to end FedEx's corporate sponsorship of the Washington team at the end of the 2020 season unless the name was changed. Specifically, on July 9, 2020, FedEx's Senior Vice President, Integrated Marketing and Communications, Jenny Robertson, wrote to "FWS" [Fredrick W. Smith] to advise him that, "as discussed," she had "shared information from the letter with Ken Belson/NYT." Ex. 19. Ms. Robertson further advised Mr. Smith that *The New York Times* article about FedEx's involvement in pushing the name change would run the following day. *Id.* An hour and a half later, Ms. Robertson confirmed to Mr. Smith that she had provided the same information to Liz Clarke at *The Washington Post* on "the same terms and conditions" as it had been provided to Mr. Belson of *The New York Times*, and had further advised Mr. Belson that she "gave the same info to another outlet." *Id.* A story on the name change ran in *The New York Times* on July 14, 2020, and in *The Washington Post* on July 13, 2020.

Then, when questions arose ███████████████████████████████, Mr. Schar resorted to conduct more reflective of a gangster than an NFL owner: On August 12, 2020 Ms. Blair, at Mr. Schar's instruction and expense, began using a flip-phone to communicate with not only Mr. Schar, but his daughter, Tracy Schar. *See* Ex. 8 at MEB-000912; Ex. 9. Thereafter, beginning at 4:41pm on August 12, 2020 through September 25, 2020, Ms. Blair had 82 calls with

---

[4] On July 16, 2020, in emails with an individual named Lee Melchionni, in response to a question about whether Ms. Blair was invited to the "sex parties" that had been reported in the media, Ms. Blair response "No those are a lie." Ex. 7 at MEB-000282.

Mr. Schar and 24 calls with Ms. Schar using the burner phone provided by the Schars. *See* Ex. 9. And consistent with Mr. Schar's efforts to shield his confidentiality breaches and extortive conduct, Ms. Blair also used the burner phone to communicate with members of the press, including 48 calls to Ms. Clarke. *Id.*

### D. Plaintiffs Acted In Concert

On June 1, 2020, the Plaintiffs demanded in unison that Mr. Snyder ██████████ ██████ Ex. 2. Plaintiffs continued to act ████████████████████████████████ ████ to further their extortive scheme and hiring the same legal representatives across a variety of disputes, include this present dispute. Plaintiffs also hired the same financial representative to jointly represent them in negotiations with Mr. Snyder.

In fact, the joint financial representative, John Moag of Moag & Co., negotiated on behalf of all three Plaintiffs, and repeatedly threatened Mr. Snyder: If Mr. Snyder did not accede to Plaintiffs' demands ████████████████ Mr. Moag would reveal dated allegations against Mr. Snyder that Mr. Schar used or attempted to use Ms. Blair to share with Ms. Clarke. Ex. 10 Moag Text.

Ms. Blair's communications further reflect that Plaintiffs were acting together. On the same day Ms. Blair first spoke with Mr. Schar, she wrote to Bobby Potter to tell her the Plaintiffs "**all** want out," and "**they** … want the NFL to force a sale." Ex. 5 at MEB-001105 (emphasis added). Ms. Blair continued: "**Fred Smith Dwight Schar and Robert Rothman are about to take on Dan Snyder and this will be epic.**" *Id.* (emphasis added). She replied to a later text message from Mr. Potter "YUP **they** can't even sell their stake in team unless dan is out nobody wants to work with dan." *Id.* (emphasis added).

Similarly, when it came to revealing confidential information to the press, Ms. Blair's communications reflect all three Plaintiffs' involvement. On July 5, 2020, **after she spoke with**

**Mr. Schar** on 10:02am, Ms. Blair texted Ms. Clarke with Mr. Schar's, Mr. Smith's and Mr. Rothman's phone numbers at 6:09pm. Ex. 6 at MEB-000599.

E.    **Their Extortionate Scheme Having Failed, Plaintiffs Seek A Third-Party Sale**

Despite the Plaintiffs' egregious and illegal conduct, Mr. Snyder refused to succumb to their demands that he ████████████████████████████████████ Their efforts proving unavailing, Plaintiffs sought to sell their minority interests in WFI to a third-party.

On October 2, 2020, Plaintiffs notified Mr. Snyder of a proposal they had received from the Potential Purchasers, ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

On October 23, 2020, Plaintiffs purported to notify WFI that they intended to sell ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Plaintiffs' TRO and PI, Ex. 4. Their Notice, entitled "RSS Stockholders' Notice of Intention to Sell WFI Stock," attached an October 16, 2020 non-binding letter of intent ("LOI") on behalf the Potential Purchasers. *Id.*

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ On November 3, 2020, Plaintiffs

and Mr. Snyder further agreed to extend the deadline to respond to the Notice to November 12, 2020, Plaintiffs' TRO and PI, Ex. 7. and on November 11, the response deadline was extended to November 16, 2020. Ex. 14.

On November 9, 2020, Mr. Snyder, through counsel, again wrote in response to the purported Notice. Plaintiffs' TRO and PI, Ex. 9. The November 9th letter informed Plaintiffs of the numerous material deficiencies in the Notice that rendered it ineffective to satisfy Plaintiffs' obligations under the Stockholders Agreement prior to their potential sale of WFI stock. *Id.*

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████

### F. The Stockholders Agreement Requirements On Notice Of Intention To Sell and Right of First Refusal

Section 7(a) of the Stockholders Agreement provides that a stockholder who proposes to effect a sale of any shares of stock (a "Selling Stockholder") is required to give a written notice setting forth in reasonable detail the terms and conditions of such proposed transaction ("Notice of Intention to Sell"). Ex. 1 § 7(a). Each other non-selling stockholder (the "Other Stockholders") has the right to elect to purchase all or part of the shares proposed to be sold by each Selling Stockholder by giving written notice within fifteen days of receipt of the Notice of Intention to Sell. *Id.* Section 7 of the Stockholders Agreement further grants each of the Other Stockholders a right of first refusal to "elect to purchase all or part of the shares of Non-Voting Stock proposed to be sold by the Selling Stockholder at a purchase price equal to (and on terms substantially comparable to) that specified in the Notice of Intention to Sell." Ex. 1 § 7(b)(i).

### G. Deficiencies With The Plaintiffs' Notice

The Notice that Plaintiffs provided on October 23, 2020, violates the requirements of the Stockholders Agreement in multiple respects. First, ██████████████████████████████████████

Second,

Third,



Indeed, while Plaintiffs allege that Mr. Snyder has somehow interfered with their sales efforts, they do not submit an affidavit or other evidence from the Prospective Purchasers concerning the status of those negotiations. Tellingly, Plaintiffs do not identify any due diligence request list that has been submitted to WFI or Mr. Snyder (because none has), nor do they provide ███████████████████████████████████████████████████████████████████████, nor do they provide drafts of any transaction documents or the promissory notes for the payment to be made over time. And despite Plaintiffs' claim of urgency because the exclusivity agreement in the LOI allegedly expires on November 25, 2020, in fact the exclusivity period is subject to an evergreen renewal in seven-day increments; Plaintiffs do not contend that any party has given notice of termination of the exclusivity provisions, nor provide any documentary evidence to support any such contention. Plaintiffs' TRO and PI, Ex. 4.

### H. Mr. Snyder Asked The Arbitral Tribunal To Resolve The Parties' Dispute With Regard To The Plaintiffs' Notice

As noted above, on June 26, 2020, Plaintiffs instituted the Arbitration against Mr. Snyder.

██████████████████████████████████████████ Plaintiffs instituted the Arbitration

pursuant to Section 8.3(A) of the NFL Constitution and Bylaw, which gives the NFL

Commissioner's full, complete, and final jurisdiction and authority to arbitrate the parties' dispute

as provided in Section 8.3(A) of the NFL Constitution and Bylaws. *See* Motion for TRO and PI,

Ex. 12. § 8.3(A)

As Plaintiffs argued, Section 22(a) of the Stockholders Agreement provides:

> Notwithstanding any agreement to the contrary, this Agreement and any and all
> other arrangements between or among the parties hereto which relates to the
> ownership or operation of the Franchise as a member club of the NFL, are subject
> to the Constitution, Bylaws, and other rules and regulations of the NFL (the 'NFL
> Rules') and to the Articles of Association and Bylaws of the NFL Management
> Council, and certain decision, rulings, resolutions, actions and other matters as
> more fully described in Paragraph 1 and other provisions of that certain consent
> letter of the NFL dated as of the closing of the Acquisition and that certain other
> consent letter of the NFL executed in connection with the sale of stock to Messrs.
> Smith, Schar and Rothman.

Ex. 1 § 22(a).

Section 8.3(A) of the NFL Constitution and Bylaws, in turn, provides that the

Commissioner "shall have full, complete and final jurisdiction and authority to arbitration ... [a]ny

dispute ... involving two or more holders of an ownership interest in a member club of the

League." *See* Motion for TRO and PI, Ex. 12. § 8.3(A). Section 3.11(A) of the NFL Constitution

and Bylaws further provides "each and all of the owners ... as well as any other person owning

any interest in such member club, assumes and agrees ... [t]hey, and each of them, shall be bound

by and will observe all decisions of the Commissioner of the League in all matters within his

jurisdiction." *Id.* § 3.11(A).

The NFL Dispute Resolution Guidelines, which clearly govern the Arbitration between the

Parties, likewise make clear that a hearing officer presiding over an NFL arbitration ("Hearing

Officer") has jurisdiction over motions for interim relief. Section 12 of the NFL Dispute

Resolution Guidelines authorizes the Hearing Officer to grant any "interim measure as he deems necessary." Motion for TRO and PI, Ex. 13 § 12.



On November 13, 2020, A half hour later Plaintiffs sent Mr. Snyder's counsel an email requesting service of the pleadings in this case. *See* Motion for TRO and PI at 13.

Instead, Plaintiffs engaged in delay tactics, filing their now pending Motion for TRO and PI with this Court on November 16, 2020,                                            .

## II.    LEGAL STANDARD

Parties seeking "extraordinary remed[ies]" including temporary restraining orders or preliminary injunctions must "clearly establish" that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Maages Auditorium v. Prince George's Cty., Md.*, 4 F. Supp. 3d 752, 760 (D. Md. 2014) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008)), *aff'd sub nom. Maages Auditorium v. Prince George's Cty., Md.*, 681 F. App'x 256 (4th Cir. 2017). Failure to clearly establish any one of these requirements dooms a motion for these remedies. *See id.*

Because the standard for a preliminary injunction or temporary restraining order is so high, such relief "should not be casually awarded," but should "granted only sparingly and in limited circumstances." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2020 WL 6500931, at *3-4 (4th Cir. Nov. 5, 2020) (internal quotation marks omitted).

## III.    ARGUMENT

### A.    This Court Is Not The Proper Forum For This Dispute

This Court should not entertain Plaintiffs' efforts to forum shop and to skirt the express and unambiguous arbitration clause governing this dispute. *See Greenville Hosp. Sys. v. Employee Welfare Ben. Plan for Employees of Hazelhurst Mgmt. Co.*, 628 F. App'x 842, 845 (4th Cir. 2015) ("Constru[ing] the arbitration clause broadly" based on "federal policy favoring arbitration"). The purported request for preliminary relief is a thinly-veiled request for the Court to determine the ultimate merits of a dispute between the stockholders under Section 7 of the Stockholders Agreement, in violation of the NFL Constitution and Bylaws and the NFL rules. Indeed, Plaintiffs filed this action knowing full well that the pending Arbitration governs all disputes relating to their respective rights as owners of WFI. Yet, ignoring all precedent, efficiency, and commonsense, Plaintiffs argue that this Court should intervene to resolve issues squarely within the jurisdiction of the pending Arbitration. The Court should not accept Plaintiffs' invitation to circumscribe the terms of the governing Arbitration clause and muddy jurisdictional waters.

Plaintiffs' continued insistence that the arbitral tribunal lacks jurisdiction over disputes with respect to the adequacy of their Notice of Intent to Sell, Mr. Snyder's right of first refusal, or the Proposed Sale is belied by the NFL Constitution and Bylaws and the Stockholders Agreement. First, Section 22(a) of the Stockholders Agreement unambiguously gives the Commissioner the authority to resolve any dispute between the Parties, and provides that "any … arrangement between or among" the Parties that "relates to the ownership or operation of" WFI is "subject to

the Constitution, Bylaws and other rules and regulations of the NFL." Ex. 1 § 22(a).

Indeed, Plaintiffs previously invoked this very provision ████████████

████████████████████.[5] Plaintiffs recognized that the NFL Constitution and

Bylaws provide the Commissioner "full, complete, and final jurisdiction and authority arbitrate ...

[a]ny dispute ... involving two or more holders of an ownership interest in a member club of the

League, certified to him by any of the disputants."). Plaintiffs TRO & PI, Ex. 12 § 8.3(A).

Plaintiffs also previously invoked and cited Section 12 of the NFL Dispute Resolution Guidelines,

which makes clear that the arbitral tribunal has jurisdiction over motions for interim relief. Rule

12 authorizes the Commission to grant any "interim measures as he deems necessary in respect of

the subject matter of the dispute." Motion for TRO and PI, Ex. 13 at § 12. Further, even if the

NFL Rules permitted Plaintiffs to seek the interim relief requested in this Court (they do not),

Plaintiffs waived any such right ███████████████████████████

███████████ *See Pisgah Labs, Inc. v. Pharmaforce, Inc.*, No. CIV. 1:05CV334, 2005 WL

3116584, at *3 (W.D.N.C. Nov. 22, 2005) (denying motion for preliminary injunction and noting

it was "compelling that Plaintiff initiated the demand for arbitration, but now seeks judicial

intervention").

Moreover, even if the NFL Dispute Resolution Guidelines did not mandate arbitration of

this dispute, Section 18(a) of the Stockholders Agreement would. Section 18(a) provides that

"[a]ny controversy or claim between or among the parties hereto including but not limited to those

**arising out of or relating to this Agreement or any related instruments, agreements or**

---

[5] Plaintiffs also recognized that the NFL Constitution and Bylaws provide that "each and all of the owners, . . . as well as any other person owning any interest in such member club, assumes and agrees to be bound by the following obligations of membership in the League: (A) They, and each of them, shall be bound by and will observe all decisions of the Commissioner of the League in all matters within his jurisdiction." Plaintiffs TRO & PI, Ex. 12 at § 3.11 (A).

**documents**, including any claim based on or arising from an alleged tort, shall be determined by binding arbitration in accordance with the Federal Arbitration Act, Title 9 of the United States Code (or if not applicable, the applicable state law), the 'Comprehensive Arbitration Rules and Procedures' (for claims in excess of $250,000) of JAMS/Endispute or any successor thereof and the 'Special Rules' set forth in clauses (i) and (ii) below." Ex. 1 § 18(a) (emphasis added). Plaintiffs seek precisely such relief in this action: They seek declaratory relief and pursue a breach of contract claim related to Mr. Snyder's purported breach of Section 7 of the Stockholders Agreement. Motion for TRO and PI at 15. Such claims are plainly arbitrable pursuant to the binding arbitration clause of the Stockholders Agreement.

Plaintiffs nevertheless argue that Section 18(b) of the Stockholders Agreement permits them to seek permanent injunctive relief from a court rather than the arbitral tribunal. Plaintiffs are wrong. Not only have Plaintiffs expressly agreed that the Stockholders Agreement is subject in all respects to the NFL Rules, but Section 18(b) of the Stockholders Agreement permits resort to court proceedings *only* for "provisional or ancillary relief." That is not the relief sought in this action. Under the guise of temporary relief, Plaintiffs in fact seek a declaratory judgment and a permanent injunction—relief that goes to the very merits of the dispute between the parties. Such a request hardly qualifies as "provisional or ancillary relief," nor should Plaintiffs be permitted to hoodwink the Court by styling this action as a claim for an injunction.

Indeed, Section 18(b) expressly provides that "[t]he institution or maintenance of any action for provisional or ancillary remedies shall not constitute not constitute a waiver of the right of any party . . . to arbitrate the merits of the controversy or claim occasioning resort to such remedies." Ex. 1 § 18(b). Jurisdiction over the issues presented by Plaintiffs in this action thus lies with the arbitral tribunal only.

The cases on which Plaintiffs rely are inapposite because in those cases the party bringing claims in court did so pursuant to the express carve-out or exemption to the operative arbitration clause. For example, in *Seery v. DePuy Orthopaedics, Inc.,* the plaintiff sought to enforce the forfeiture provision of the operative agreement between the parties, which was specifically outlined and provided in a separate section of the agreement (Section 13) and carved out as a claim for which the parties could initiate court action. No. 2:14-CV-04262-RMG, 2014 WL 12609706, at *2 (D.S.C. Dec. 31, 2014). Similarly, in *Rescuecom Corp. v. Chumley*, the arbitration clause carve out permitted the Franchisor to bring a court action for "injunctive or other provisional relief as Franchisor deems to be necessary or appropriate to compel Franchisee to comply with its obligations hereunder or to protect its [Trademarks] or other property rights of Franchisor," under which the plaintiff sought corresponding relief to protect its mark. 522 F. Supp. 2d 429, 451 (N.D.N.Y. 2007). In *Remedy Intelligent Staffing, Inc. v. Metro. Employment Corp. of Am.*, the arbitration clause carve out was limited to "injunctive or other provisional relief…to compel Franchisee to comply with Franchisee's obligations under this Agreement or to protect the marks." No. CIV.A. 08-11369RGS, 2008 WL 5156609, at *2 (D. Mass. Dec. 9, 2008). But even that court ultimately denied the preliminary relief sought. *Id.* In *Stockade Companies, LLC v. Kelly Rest. Grp., LLC*, the agreement explicitly allowed an action for "temporary or permanent injunctive relief," which was the relief the franchisor sought, and is notably different from "provisional or ancillary remedies." No. A-17-CV-143 RP, 2017 WL 1968328, at *2 (W.D. Tex. May 11, 2017). Here, by contrast, Plaintiffs seek declaratory and permanent injunctive relief not permitted by Section 18(b), and which go to the merits of expressly arbitrable claims.

Finally, Plaintiffs incorrectly argue that they are entitled to relief from this Court under the first-to-file rule. That doctrine is meant to "promote judicial efficiency, eliminate potential waste,

and prevent the possibility of inconsistent judgments." *Capitol Payment Sys., Inc. v. Di Donato*, 2017 WL 2242678, at *12 (D. Md. May 23, 2017). To the extent the rule applies when one action is an arbitration, its purpose is to ensure that the first suit filed should take priority over a subsequent suit unless the "balance of convenience" favors the second forum.

Here, there has been an active Arbitration involving the parties to this action since June 2020. The Arbitration is therefore the "first filed" action. Indeed, the Parties have asserted █████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████ In any event, this Court should reject an end run on a mandatory arbitration clause under the guise of a first filed lawsuit, especially since adjudicating a similar dispute concerning ownership issues and stockholder rights in federal court at this point would prove inefficient and wasteful. Moreover, the "balance of convenience" favors trying all related issues in the existing forum, rather than permitting Plaintiffs to forum shop five months into the pending Arbitration.

## B. Plaintiffs Are Unlikely To Succeed On The Merits

Beyond the fact that Plaintiffs are not entitled to relief pursuant to their Motion for TRO and PI because this Court is the improper forum for such relief, should the Court reach the merits, Plaintiffs fall far short of the hurdle for obtaining a TRO or a PI. Plaintiffs seek declaratory relief that Mr. Snyder's timely and proper exercise of his right of first refusal ████████████████ ████████ was actually ineffective. Plaintiffs cannot obtain this final relief on a motion for a TRO or PI; rather, the most temporary or preliminary relief can provide is to maintain the status quo pending a final determination on the merits—████████████████████████████ ████████████████████████████████ *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999) ("While a preliminary injunction preserves the

status quo pending a final trial on the merits, a temporary restraining order is intended to preserve the status quo only until a preliminary injunction hearing can be held."). And the final sentence of Section 18(b) of the Stockholders Agreement – nowhere addressed in Plaintiffs' brief – expressly provides that that ultimate determination is for the arbitrator, not the Court. In any event, Plaintiffs are unlikely to succeed on the merits of this dispute because they ignore the plain meaning of their obligations under the Stockholders Agreement.

      i.      *Mr. Snyder's Exercised Right Of First Refusal Was Timely And Appropriate* ████████████████████

At the outset, Plaintiffs acknowledge the Stockholders Agreement requires ████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

███████████████████

    ███████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

---

6 ████████████████████████████████████████

████████████████████████████████████████
███████████████

20

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████  Rather, the explicit terms of Section 7(a) must be given effect.  *See URS Corp. v. Maryland-Nat'l Capital Park & Planning Comm'n*, 2018 WL 3323194, at \*6 (Md. Ct. Spec. App. July 6, 2018) ("[W]e construe the contract in its entirety, meaning that, if reasonably possible, we give effect to every clause and phrase, so as not to omit an important part of the agreement.") (internal quotation and citation omitted).

Mr. Snyder's exercise of his right of first refusal ████████████████████████ was timely and appropriate pursuant to Section 7 of the Stockholders Agreement.  The likelihood of success for Plaintiffs on their request that Mr. Snyder's already-exercised right of first refusal be enjoined is dim.  Plaintiffs argue Mr. Snyder failed to meet the provision of Section 7(b) of the Stockholders Agreement because ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████    ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████    ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

Because Mr. Snyder's right of first refusal complied in all materials respects with the Stockholders Agreement, Plaintiffs' attempt to enjoin his rights will not succeed on the merits.

      *ii.*        *Plaintiffs Cannot Hide Behind Their Deficient Notice*

It is difficult to reconcile Plaintiffs' insistence that Mr. Snyder's right of first refusal was inadequate and therefore his rights should be enjoined indefinitely, when Plaintiffs' own Notice was materially and facially deficient. Plaintiffs concede that the Stockholders Agreement requires any Notice of Intention to Sell to set forth "**in reasonable detail the terms and conditions of such proposed transaction**, including the identity of the proposed purchased or such shares **and enclosing any agreements, draft agreements or letters of intent relating to such proposed Sale**." Plaintiff TRO and PI at 17 (emphasis added). But Plaintiffs' Notice failed to meet these plain terms in three materials respects. First, their notice ██████████████████████████

███████████████████████████████████████████████████████████████████

██

      Second, Plaintiffs' Notice █████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████ Despite Mr. Snyder's request for additional details on these terms, Ex. 11, and the plain language of the Stockholder Agreement, Plaintiffs' Notice remains deficient. *See RCM LS II, LLC v. Lincoln Circle Assocs., LLC*, 2014 WL 3706618, at *8 (Del. Ch. July 28, 2014) (deeming right of first offer insufficient for failure to include material terms such as termination rights, related fees, and upside protection set out in separate letter with contemplated third party purchaser); *see also Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745, 750 (D. Md. 2013) ("The primary purpose of the notice

by the property owner is to provide the holder of the right of first refusal with sufficient information to determine whether he is interested in exercising the right.") (citing *John D. Stump & Assoc. v. Cunningham Memorial Park*, 419 S.E.2d 699, 706 (W.Va. 1992)). ███████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████

Third, and lastly, Plaintiffs' Notice is deficient because ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████ constitutes a material omission in the Notice. *See ODS Techs., L.P. v. Marshall*, 832 A.2d 1254, 1260 (Del. Ch. 2003) ("An omitted

fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.") (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 2475, 1277 (Del. 1994). Accordingly, Plaintiffs' offers ████████████████████████ ████████ and Plaintiffs' claim cannot survive on the merits.

### C. There Is No Irreparable Injury Here For Plaintiffs

The mere assertion of a time-sensitive opportunity is plainly insufficient to trigger a finding of irreparable harm, despite Plaintiffs' proclamation to the contrary. Motion for TRO and PI at 26-27. In the first instance, Plaintiffs have not treated the sale of their business assets as sensitive. Mr. Snyder's time to respond to Plaintiffs' Notice was extended twice. Plaintiffs' TRO and PI, Ex. 7; Ex. 14. Further the exclusivity period is not as limited as Plaintiffs claim. The LOI defines the exclusivity period as "the period beginning on the date hereof and continuing for thirty (30) days following the exaction of this Proposal by the Sellers." Motion for TRO and PI at 8. The LOI is dated October 16, 2020, Motion for TRO and PI, Ex. 3, yet Plaintiffs repeatedly allege the exclusivity period ends on November 25, 2020, *see e.g.*, Motion for TRO and PI at 27, more than 30 days after the original term of the exclusivity period. Moreover, by the very terms of LOI, the exclusivity period is subject to an evergreen renewal in seven-day increments: "[T]he Exclusivity Period shall automatically be extended for subsequent one week periods in the event neither party has terminated the Exclusivity Period." Motion for TRO and PI at 8.

Plaintiffs' harm from the automatic, renewing exclusivity period is nonexistent. And the risk that the exclusivity **may** be terminated is simply not enough. A party seeking an injunction must prove more than a risk of a future irreparable harm. *Schade v. Maryland State Bd. of Elections*, 401 Md. 1, 39-40 (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ("Establishing a risk of irreparable harm is not enough."). In seeking an injunction, a "plaintiff has

the burden of proving a clear showing of immediate irreparable injury," *id.*, and that injury must be one that cannot be adequately and completely compensated with money. *See, e.g., Annapolis Professional Firefighters Local 1926, IAFF v. City of Annapolis*, 100 Md. App. 714, 722 (1994) ("Injunctive relief is inappropriate because Plaintiffs have failed to establish that they will suffer immediate, irreparable injury which cannot be readily, adequately and completely compensated with money.").

Plaintiffs also allege that Mr. Snyder's supposed delay tactics have "frustrated the due diligence" process. Motion for TRO and PI at 27. But Plaintiffs do not allege how or in what way Mr. Snyder has delayed the due diligence process. Plaintiffs do not identify any due diligence request list that has been submitted to Mr. Snyder (because none has), ███████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████. Indeed, if Plaintiffs were interested in a timely resolution of the dispute regarding their Notice and Mr. Snyder's right of first refusal, ████████████████████████████████████████████████████████████████ ██████████████████████████████. Instead Plaintiffs declined to maintain the status quo and filed a duplicative motion before this Court.

Accordingly, Plaintiffs' contention that they would be irreparably harmed by being "forced to litigate the same issues in two forums and be subject to potentially inconsistent rulings," Motion for TRO and PI at 29, is a product of their own improper litigation tactics. ███████████████ ████████████████████████████████████████████████████████████████ ██████ Plaintiffs are now supposedly harmed by the Arbitration they requested. Rather, it is

Plaintiffs who have engaged in inappropriate forum shopping, asking this Court to hear its TRO and PI claims when the very same dispute was already before the arbitral tribunal.[7]

Without any substantive harm to point to, Plaintiffs claim that Section 17(c) in the Stockholders Agreement—which provides the parties "acknowledge that remedy at law for breach of the provisions of this Agreement will be inadequate and that … it shall be entitled to an injunction restraining any breach or threatened breach and/or decree of specific performance," Ex. 1 § 17(c)—should establish Plaintiffs irreparable harm. But such provisions are not decisive of a request for equitable relief. *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 353 (4th Cir. 2011) ("[A]s the Tenth Circuit concluded after canvassing extant case law, contractual agreements alone do not control the district court's exercise of its equitable discretion."). Even Plaintiff's own cases stand for the proposition that an injunctive relief provision is not sufficient. *See Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69 (2d Cir. 1999) ("To the contrary, we think for **several** reasons irreparable harm was shown to be present in this case. Initially, it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client."); *Kansas City S. v. Grupo TMM, S.A.*, 2003 WL 22659332, at *5 (Del. Ch. Nov. 4, 2003) ("[A] contractual stipulation as to the irreparable nature of the harm … cannot limit this Court's discretion to decline to order injunctive relief.").

Thus, Plaintiffs have failed to articulate an irreparable harm, and Plaintiffs' TRO and PI Motion should be denied on this basis alone.

**D.     Mr. Snyder Will Be Substantially Harmed If Injunctive Relief Is Granted**

---

[7] Plaintiffs' cited cases are inapposite. Motion for TRO and PI at 29. Plaintiffs are not being compelled to arbitrate claims it did not agree to arbitrate. In fact, Plaintiffs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

26

If the Court grants the relief sought by Plaintiffs and enjoins his exercise of refusal as well as his ability to arbitrate this matter, he will be irreparably harmed by the loss of his unique contractually bargained-for right to exercise first refusal as well as his right to binding arbitration on all disputes related to rights under the Stockholders Agreement. Plaintiffs have understood and agreed to Mr. Snyder's right of first refusal as reflected in their agreement to the Amended and Restated Stockholders Agreement. And they have agreed to abide by the NFL Commissioner's exclusive "full, complete, and final jurisdiction and authority" to arbitrate the Parties' dispute pursuant to the NFL Constitution and Bylaws. Plaintiffs TRO & PI, Ex. 12 at § 8.3(A).

Harm is irreparable where no "alternative legal redress [is] clearly available and [is] as practical and efficient to the ends of justice and its prompt administration as the remedy in equity." *T. Rowe Price Recovery Fund, L.P. v. Rubin*, 770 A.2d 536, 557 (Del. Ch. 2000) (internal quotation omitted). Such harm "exists where interference with a clear legal right necessarily will occur absent injunctive relief and it appears that money damages will not be adequate,"[8] as well as where damages "would involve speculation." *In re Shawe & Elting LLC*, 2015 WL 4874733, at *28 (Del. Ch. Aug. 13, 2015) (internal quotation marks omitted), *aff'd sub nom. Shawe v. Elting*, 157 A.3d 152 (Del. 2017).

Here, money damages would not be adequate to remedy Mr. Snyder's harm. Rather, Mr. Snyder and the Other Shareholders would lose the opportunity to purchase any of Plaintiffs' shares - a specific and valuable asset. Indeed, "[s]hares in a closely-held corporation are unique, such that money damages would be insufficient to remedy [the defendant's] breach of the [shareholders agreement]." *Jacobson v. Ronsdorf*, 2005 WL 29881, at *3 (Del. Ch. Jan. 6, 2005), *aff'd*, 906 A.2d 807 (Del. 2006). Mr. Snyder's lost opportunity to purchase these unique shares thus cannot

---

[8] *USACafes v. Office*, 1985 WL 44685, at *4 (Del. Ch. Oct. 28, 1985) (internal citation omitted).

be remedied with mere money damages. Estimating the cost of such harm would necessarily involve speculation.

Moreover, if Plaintiffs ███████████████ before the arbitral tribunal's resolution of this dispute, Mr. Snyder cannot be adequately compensated with money damages. Instead, to fully restore the parties to their original position, the transaction would need to be unwound, which is a drastic and often impracticable remedy.

### E.    The Balance Of Equities Favors Denying Plaintiff's Request For Injunctive Relief

Plaintiffs have not "clearly established" that the balance of equities tips in their favor. *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 650-51 (D. Md. 2002) (where both parties suffered some economic injury, the moving party did not meet their burden). To the contrary, granting Plaintiffs injunctive relief would create substantially more hardship for Mr. Snyder because doing so would effectively void his bargained-for right of first refusal to purchase WFI shares. Such relief could jeopardize the parties' contractual stock transfer restriction, which allows the shareholders to "[maintain] some measure of choice in taking in new shareholders." *Capital Grp. Cos. v. Armour*, 2005 WL 678564, at *8 (Del. Ch. Mar. 15, 2005) (citation omitted).[9] Indeed, a primary reason for stock transfer restrictions is that "stock in a small corporation is not merely property . . . it also creates a personal relation analogous to a partnership and . . . the owners have reason to prevent unacceptable outsiders from acquiring an interest in the entity." *Salt Lake Tribune Publ. Co. v. AT&T*, 320 F.3d 1081, 1087 (10th Cir. 2003) (citations omitted).

By contrast, a short delay will not materially impact the viability of the transaction. Changes in NFL team ownership involving new owners of more than 5% of a team's shares

---

[9] Where Maryland law is silent on matters of corporate law, courts look to Delaware law as persuasive authority. *Tackney v. U.S. Naval Acad. Alumni Ass'n, Inc.*, 408 Md. 700, 719 (2009).

normally take months, requiring an extensive background investigation and affirmative vote of 75% of the Executive Committee. Notwithstanding Plaintiffs' representation that the Potential Purchasers' "exclusivity period" lasts until November 25, 2020, the LOI in fact does not include any cutoff date and the exclusivity period contains an evergreen renewal absent termination by any party. And the Prospective Purchasers tout their "high degree of confidence in [their] ability to execute definitive documentation promptly ███████████████████████████ ██████████████████ Plaintiffs' TRO and PI, Ex. 4. A short delay will do little to impact Plaintiffs' posture in their attempt to divest WFI shares.

Indeed, Plaintiffs face no irreparable harm at all. ████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ █ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████

The balance of equities therefore militates against granting Plaintiffs injunctive relief, thereby depriving Mr. Snyder out of his unique rights regarding the transfer of ownership in WFI.

---

[10] The equitable doctrine of unclean hands denies relief to those guilty of unlawful or inequitable conduct with respect to the matter for which relief is sought. *Hicks v. Gilbert*, 135 Md.App. 394, 400, 762 A.2d 986 (2000). "[I]t protects the integrity of the court and the judicial process by denying relief to those persons whose very presence before a court is the result of some fraud or inequity." *Id.* (internal citation and quotes omitted). It is, thus, difficult to imagine a greater need to abide the "maxim 'he who comes into equity must come with clean hands.'" *Mona v. Mona Elec. Grp., Inc.*, 176 Md. App. 672, 713 (2007) (quoting *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945)).

**F.      The Public Interest Will Not Be Served By Granting Injunctive Relief**

There is a strong federal policy favoring arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."). Plaintiffs instituted the confidential arbitration ████████████████ ██████████████████████████████ and the proceeding is grounded in the Commissioner's authority to adjudicate "the best interests of the League or professional football." Thus, the broader "public interest" constituent contemplated here is fairly assessed as the interests of the NFL. Among other interests, the NFL Constitution makes clear the critical importance to the League of having each club speak in the single voice of a Principal Owner:

> the fundamental aspect of our policy is to make sure that we have an individual who has the ultimate authority over the franchise, and to make those decisions, including league-vote decisions, as well as locally, and it's clear—it's clear to the ownership group and it's also clear to the membership.[11]

Indeed, the League's interests in public unity, confidentiality, discretion, and stability have been well-served by Mr. Snyder, but Plaintiffs' action before this Court seeks to usurp the arbitral tribunal's jurisdictional reach, materially alter the governance and shareholder structure of the Washington Football Team, and deprive Mr. Snyder of his unique, bargained-for contractual right of first refusal as Principal Owner of the Washington Football Team. Thus, granting the relief sought by Plaintiffs in this forum would severely harm public interest by dismantling the enforceability to valid contracts and destroying the duties and obligations of Parties as fiduciaries to each other.

**IV.      CONCLUSION**

---

[11] Jason Wolf, "Titans, NFL still at odds over ownership structure," THE TENNESSEAN (Feb. 1, 2017 5:43 PM), https://www.tennessean.com/story/sports/nfl/titans/2017/02/01/titans-nfl-still-odds-over-ownership-structure/97367504/.

For all the foregoing reasons, Defendant respectfully requests this Honorable Court deny Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction.

Dated: November 17, 2020           MILES & STOCKBRIDGE P.C.

*/s/ Rachel T. McGuckian*
Rachel T. McGuckian
11 N. Washington Street
Suite 700
Rockville, MD 20850
Phone: (301) 517-4816
Fax: (301) 762-0363

DECHERT LLP

Andrew J. Levander (pro hac vice pending)
Neil A. Steiner (pro hac vice pending)
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036
Phone: (212) 698-3500
Fax: (212) 698-3599
andrew.levander@dechert.com
neil.steiner@dechert.com

Christina Guerola Sarchio (pro hac vice to be submitted)
1900 K Street NW
Washington, D.C. 20006
Phone: (202) 261-3300
Fax: (212) 261-3333
christina.sarchio@dechert.com


TACOPINA, SEIGEL & DEOREO

Joseph Tacopina  (pro hac vice pending)
275 Madison Avenue
New York, New York 10016
Phone: (212) 227-8877
jtacopina@tacopinalaw.com

**Counsel for Defendant Daniel M. Snyder**