# Notice of Supplemental Authority
# EXHIBIT A

# Fight for Washington N.F.L. Team May Tighten Owner's Grip on It

Washington's owner, Daniel Snyder, is working to buy out three minority partners, including one he has accused of running a smear campaign against him.

 

By Ken Belson and Katherine Rosman

Dec. 19, 2020

By the end of this summer, Daniel Snyder, the majority owner of the N.F.L.'s Washington Football Team, was facing fire from many sides. Fans had long blamed him for the team's abysmal performance. Now civil rights groups were criticizing Snyder for waiting so long to jettison a team name and logo that they considered racist, and women's activists were aghast after news media reports detailed a culture of sexual harassment in the team's front office.

In a normal corporate setting, any one of these troubles might have led to a leader's ouster. Instead, Snyder, a member of the N.F.L.'s cozy club of billionaire owners, may emerge from months of crisis with an even tighter hold on one of the most lucrative franchises in the league. Snyder is in talks to buy out three of his partners, and the sale price may be 40 percent less than they were asking in June.

According to three people familiar with the plan who were not authorized to speak publicly about it, Snyder would pay up to $900 million for the 40 percent of the club owned by the three partners: Frederick W. Smith, the chairman of FedEx; the financier Robert Rothman; and Dwight Schar, a real estate developer. The deal must be approved by the league.

Representatives for Snyder and the partners' banker declined to comment on the talks. The N.F.L. did not respond to a request seeking comment.

The deal, if completed and approved, would end one of the more nasty and tangled ownership battles in the league in years, a bitter divorce that has included accusations of bad faith, malfeasance and mudslinging in a league that prefers such infighting be kept behind closed doors.

Sales of shares in N.F.L. teams are normally cloaked in secrecy, with information tightly guarded by the principals and their lawyers and bankers. The boardroom battle in Washington, though, spilled into courts from California to Virginia and even New Delhi before finally landing in the lap of an arbitrator appointed by the N.F.L. to sort out the mess.

The court papers in the various lawsuits that have been filed offer an unusual look at an eight-month dispute that has included the use of burner phones, profane text messages, accusations of leaks of credible and fabricated information to the news media, and threats of extortion, according to transcripts of phone calls, text messages and emails found in court filings and other documents reviewed by The New York Times.

The fight over the team began in the spring, when the limited partners accused Snyder of mismanagement of the team he has owned since 1999, including improperly throwing them off the board, making financial transactions without their approval and trying to block the sale of their shares to outside investors.

Snyder claims, in court filings, that Schar, in retribution, schemed to leak to the news media negative information about Snyder's personal life and operation of the team in the hope that it would be damaging enough to compel him to sell it. The sale of the entire team — not only Snyder's share but also the stakes owned by Schar, Smith and Rothman — would significantly inflate the value of the nonvoting shares the three minority partners have been trying to sell since this spring.

A lawyer for Schar did not respond to a request for comment.

The team, 6-7 but on track for a playoff spot, has been playing better this season under a new coach. It is at the top of its chaotic division with three games left in the regular season.

---

**DEALBOOK:** *An examination of the major business and policy headlines and the power brokers who shape them.*

Sign Up

Yet Snyder has been trailed by controversy, including accusations from cheerleaders that they were sexually harassed and intimidated on the job by well-heeled supporters and team employees, and the allegations of widespread sexual harassment in the team's front office that remain under investigation by the league.

But, according to people with knowledge of the negotiations, N.F.L. owners believe Schar crossed a line in seeking to publicly malign Snyder. Even so, kicking out an owner or part owner is seen as a rare, last resort, and so they are pushing for a settlement in which Snyder would buy out the partners.

Under the plan representatives for the partners are working out, Schar's proceeds would be reduced by millions of dollars as a penalty for trying to publicly undermine Snyder, according to three people aware of the potential penalties. Even then, he will walk away with hundreds of millions of dollars.

"The most important thing for the league is its image," said Upton Bell, a longtime team executive and the son of the former N.F.L. commissioner Bert Bell, speaking generally about ownership disputes. "They want to make it look like it's Disney World when it's not. It's business, it's not a moral universe."

The fight, at heart, is over money.

The limited partners grew disenchanted in May when, during the height of the coronavirus pandemic that was threatening the coming N.F.L. season, Snyder halted the payment of annual dividends to Schar, Rothman, Smith and other limited partners. He did not explain the decision, but it was consistent with similar steps taken by other owners.

In a letter reviewed by The Times, Schar's representative then asked Snyder for the team's financial records for the past two years, including cost-cutting measures. In early June, Snyder was told that Schar and Rothman had joined Smith, who had been trying to sell his shares for about a year, in putting their stakes on the market. This created a 40 percent block that Rothman argued in a letter to Snyder's banker was worth $1.5 billion, based on the team's total valuation.

Angered that his longtime partners were shopping their shares, Snyder threw them off the board of the team's holding company in June. The partners asked the N.F.L. to settle the dispute, claiming that Snyder failed to hold board meetings and did not get proper approval for financial transactions. The league appointed an arbitrator to the case at the end of June.

Amid the crossfire of letters between lawyers, Snyder asserted that Schar began a long-shot smear campaign designed to embarrass him and force him to sell the entire team. Snyder has long insisted that he intends to leave his controlling share to his children.



Dwight Schar, a limited partner in the team, could be bought out.    George Gojkovich/Getty Images

Key to the scheme, court filings show, was Mary Ellen Blair. She was an executive assistant to him until 2017 who, at the behest of Schar, helped pass negative information about Snyder to the news media. Between July and October, Blair and Schar spoke 157 times on the phone, for a combined 11.6 hours, according to phone records obtained by Snyder's lawyers and filed in court.

During that same period, Blair dialed or received 123 calls from telephone numbers associated with The Washington Post, according to court filings. There were text messages, too, Snyder said. "Call me ASAP Mr Schar just called me great news for u call me ASAP please," she wrote in one of several texts to a journalist at The Post who contributed to a blockbuster article in which 15 female former team employees revealed rampant, longstanding harassment of women employees. ("The idea is to force Snyder to sell," Blair texted to a friend.)

The Post article in July did not directly connect Snyder to the harassment claims. But he hired a Washington-based law firm, Wilkinson Walsh, to look into the allegations. The N.F.L. took over the investigation, which is continuing.

"While I was unaware of these allegations until they surfaced in the media, I take full responsibility for the culture of our organization," Snyder said in a statement after a second article by The Washington Post linked to him to two allegations of harassment, both of which he denied.

As the substantiated reporting got people talking on social media, less reputable outlets tried to capitalize on online interest in Snyder. The day The Post published its first report of chaos in the front office, a website owned by an Indian company, Media Arts Entertainment WorldWide, published two items about Snyder. One falsely linked him to the convicted sex offender Jeffrey Epstein.

Representatives for Media Arts Entertainment admitted they had relied on sources including a Reddit post, and removed the two items from their website. But Snyder sued the publication for defamation in August in India. (The case is ongoing.)

Snyder used the suit filed in New Delhi to search for ties to Schar. His lawyers filed a string of discovery motions in federal court in the United States and obtained Blair's phone records and text messages, which showed her communications with Schar and his daughter, Tracy, who, records show, made or received 44 calls to or from Blair. The records also showed that Tracy Schar bought Blair a burner phone to escape detection.

When Snyder's lawyers confronted Blair about her phone records late this fall, she gave a sworn declaration that has been reviewed by The Times. In it, she said she and Dwight Schar discussed an allegation that Snyder had sexually harassed a former female team employee in 2009.

"Schar knew I would take that information about that employee's sexual harassment claim to the Washington Post, and Schar was encouraging me to share the information with the Washington Post," Blair said in the declaration.

It is unclear if she shared the information. A spokeswoman for The Post declined to comment.

Two investigations conducted in 2009, one by the team and another by an outside law firm hired by the team, said they were unable to substantiate the woman's claim that Snyder had accosted her in April 2009 on a flight to Washington from Las Vegas. The team fired the woman because it said she lied to the team's lawyers.

To avoid any potential negative publicity if the woman sued Snyder, the team paid her a financial settlement and five people, including Snyder and the accuser, signed nondisclosure agreements, according to a person with knowledge of the arrangement who was not authorized to discuss it publicly.

A spokesman for Snyder declined to discuss the settlement.

Even so, Schar tried to use the settlement against Snyder. In late July, he called Norman Chirite, one of Snyder's lawyers, and said that "the story was out" about the 2009 settlement and its public disclosure is "going to kill Dan," according to Chirite, who gave a signed declaration that was reviewed by The Times.

Schar said Snyder would have a "horrible existence" when the settlement was made public. "Dan should just sell the team," Chirite recalled Schar's saying. "He won't have a choice."

Now, the reverse may happen: Snyder will not only keep the team, but possibly tighten his grip on it.

Ken Belson covers the N.F.L. He joined the Sports section in 2009 after stints in Metro and Business. From 2001 to 2004, he wrote about Japan in the Tokyo bureau. @el_belson

Katherine Rosman is a features reporter on the Styles desk. She covers media, the business of fitness, and the politics of gender. She joined The Times in 2014. @katierosman

A version of this article appears in print on , Section D, Page 1 of the New York edition with the headline: Snyder May Emerge Stronger From a Messy, Lurid Ownership Dispute