UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND
*Southern Division*

| | |
|---|---|
| ROBERT ROTHMAN, et. al.,<br><br>                    Plaintiffs,<br><br>-against-<br><br>DANIEL SNYDER,<br><br>                    Defendant. | **FILED UNDER SEAL**<br><br>Case No. PJM-20-3290 |

**DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION CONCERNING VIOLATION OF THE COURT'S NOVEMBER 19, 2020 ORDER**

Defendant Daniel M. Snyder, by his undersigned attorneys, respectfully submits this Memorandum of Points and Authorities in Opposition to Plaintiffs' Emergency Motion Concerning Violation of the Court's November 19, 2020 Order ("Mr. Snyder's Opposition" or "Def. Opp.").[1]

Mr. Snyder, his attorneys, and his agents vehemently deny that they shared any information with the media about any aspect of this dispute – not the arbitration, the litigation, or any negotiations. A review of the information Plaintiffs provided and the timeline of events set forth below demonstrates that Mr. Snyder is not responsible for any information leaked to the media.

---

[1] References to "Pls.' Mot." herein refer to Plaintiffs' Emergency Motion Concerning Violation of the Court's November 19, 2020 Order (Dkt. No. 70) and references to "Pls.' Supp. Mot." herein refer to Plaintiffs' Notice of Supplemental Authority In Support Of Plaintiffs' Emergency Motion Concerning Violation Of The Court's November 19, 2020 Order (Dkt. No. 77). References to "Exhibits" or "Ex." herein refer to the exhibits attached the accompanying Declaration of Careen Winters, dated December 22, 2020.  References to "Levander Declaration" refer to the accompany Declaration of Andrew J. Levander, dated December 22, 2020.   References to "Snyder Declaration" refer to the accompany Declaration of Daniel M. Snyder, dated December 22, 2020.

1

The Court should reject Plaintiffs' outrageous and unsubstantiated accusations to the contrary, which are themselves frivolous and sanctionable.

As the public documents reveal, Mr. Snyder is seeking to negotiate a deal with the Plaintiffs to purchase their minority interest in non-party Washington Football, Inc. ("WFI"). The notion that he would do anything that might work against his interests and risk sabotaging his own deal makes no sense. Indeed, if Mr. Snyder sought to undermine Plaintiffs' credibility in the public realm, rather than focus on defeating their baseless claims, he would have done so at the height of when the most offensive, utterly false, and grossly misleading information was being published about him – ███████████████████████████████████████████████. And as to the substance of Plaintiffs' motion, while the information published by *The New York Times* has stalled what had been productive discussions, none of the allegedly disclosed information (which was not was leaked by Mr. Snyder in any event) violates the Court's protective order. Nor have Plaintiffs suffered any cognizable harm as a result. Accordingly, the Court should deny Plaintiffs' emergency motion for sanctions.

## FACTUAL BACKGROUND

Defendant incorporates by reference the history of the dispute among the parties discussed in his prior filings.[2] That history confirms Mr. Snyder's persistent interest in maintaining a high level of confidentiality around this dispute. Plaintiffs commenced an arbitration before the NFL Commissioner in June 2020. Opp. to TRO and PI at 4. Plaintiffs then proceeded to orchestrate a

---

[2] *See* Defendant's Memorandum of Law in Opposition to Plaintiffs' Emergency Motion for a Temporary Restraining Order and Preliminary Injunction (Dkt. No. 27) ("Opp. to TRO and PI"), Defendant's Memorandum of Reasoning and Authorities in Response to Plaintiffs' Emergency Motion for Protective Orders (Dkt. No. 25) ("Resp. to Emergency Mot. for Protective Orders"), Defendant's Response to Intervenor National Football League's Memorandum of Law Regarding the NFL Commissioner's Exclusive Jurisdiction to Arbitrate the Parties' Dispute (Dkt. No. 53).

public smear campaign against Mr. Snyder, which resulted in negative press coverage about Mr. Snyder beginning in July 2020. *Id.* at 4-5. As the now public filings in this case make clear, Plaintiffs then attempted to conceal their conduct. *See id.* 4-7. ███████████████ ███████████████████████████████████████████████ *Id.* at 4. When ███████████████████████████ a proceeding under Section 1782 was brought against Ms. Blair, ███████████████████████████████ ██████████████████████. *Id.* at 6-7. ███████████████████ ██████████████████████████████. *See* Resp. to Emergency Mot. for Protective Orders at 4 (███████████████████████████████ ██████████████). Despite all of this, Mr. Snyder has engaged in negotiations with Plaintiffs. In fact, ████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████.

One of the central issues in this case, after the threshold question of the Court's jurisdiction is resolved, is whether Mr. Snyder properly exercised his right of first refusal ███████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████ Discussions between Mr. Snyder and Plaintiffs, through their respective representatives, have been ongoing since Plaintiffs first provided Mr. Snyder with a purported notice of their intent to sell in October 2020. Snyder Declaration ¶ 3. Multiple press outlets previously reported on these negotiations, as Mr. Snyder has noted to the Court. *See* Resp. to Emergency Mot. for Protective Orders, Ex. 17 (Ken Belson and Katherine Rosman reporting on November 13, 2020 that Plaintiffs had received an offer to buy their 40% interest in WFI for $900

million). Those reports identified the proposed sale price for all of Plaintiffs' WFI stock at $900 million. *Id.*[3] █████████████████████

██████████████████████████████████████

████████████████. *See* Opp. to TRO and PI at 4.[4] █████████████

██████████████████████████████████████

██████████████████████████████████████

████████ Snyder Declaration ¶ 3; Levander Declaration ¶ 3. ████████

---

[3] *See also* Will Hobson, Mark Maske & Liz Clarke, *Washington Football Team Minority Owners Have A Deal To Sell But Daniel Snyder Is Blocking It*, THE WASHINGTON POST, (Nov. 20, 2020), https://www.washingtonpost.com/sports/2020/11/20/daniel-snyder-washington-football-minority-owners-sale/ ("A group of investors from California offered $900 million for a 40 percent stake in the Washington Football Team, according to two people familiar with the matter and documents reviewed by The Washington Post.") *and* Daniel Kaplan, *Washington's Dan Snyder 'Unlawfully' Blocking Partners' Sale, Lawsuit Alleges*, THE ATHLETIC (Dec. 12, 2020), https://theathletic.com/2256849/2020/12/12/washington-dan-snyder-ownership-lawsuit/ ("The details of the partners' sale agreement are redacted in the complaint, but much of it has been reported by The Washington Post. Behdad Eghbali and José Feliciano — the billionaire co-founders of private equity firm Clearlake Capital — and Feliciano's wife, Kwanza Jones, agreed to pay $900 million for the three stakes, the Post reported last month. The newspaper reported Snyder, who owns 40.459 percent of the team, is seeking to buy out only the combined 25.331 percent held by Rothman and Smith, not the 15.168 percent owned by Schar. The complaint suggests Snyder's offer did not equal the original and is thus insufficient.").

[4] *See also* Liz Clarke, Will Hobson & Beth Rein, *Tensions Rise In Washington Football Team Ownership Breakup, Unsealed Court Filings Show*, THE WASHINGTON POST (Dec. 19, 2020), https://www.washingtonpost.com/sports/2020/12/19/dan-snyder-minority-owners-feud/ ("The team is worth $3.5 billion, according to Forbes's 2020 valuation. A 40 percent stake, at that market value, would be worth $1.4 billion. Those figures typically only hold when the team is sold in its entirety, according to industry experts; shares for minority ownerships in NFL franchises are worth less because they carry no authority in the team's operations.") *and* Ken Belson & Katherine Rosman, *Washington N.F.L. team's Drama Fueled By Owners' Fight Over Payout*, THE NEW YORK TIMES (Sept. 25, 2020), https://www.nytimes.com/2020/09/25/sports/football/washington-nfl-team-owners-dan-snyder.html?smid=tw-share ("In early June, David Koche, a lawyer representing the three limited partners, sent a letter to Norman Chirite, a lawyer representing Snyder. To help his clients sell their shares, Koche asked for the team's financial records, including all of the team's 'transactions with any insiders or entities controlled by insiders.' If Snyder wanted 'to avoid an expensive and lengthy due diligence process and detailed review' of the team's books, Koche said, Snyder should think about buying out the three partners 'at fair value.'").

███████████████████████████████████████████████████. Levander Declaration ¶ 3. Neither Mr. Snyder nor any of his advisors disclosed the existence nor terms of these negotiations to any member of the press directly or indirectly, nor had any incentive to do so. Snyder Declaration ¶ 4.

On December 18, 2020 at 6:33 am EST, Katherine "Katie" Rosman, a reporter with *The New York Times*, emailed David Koche, attorney for Plaintiffs, seeking comment on a story covering confidential discussions among Mr. Snyder and the Plaintiffs:

> My name is Katie Rosman and I am a reporter for the New York Times. With my colleague Ken Belson, I am reporting a story that involves your client Dwight Schar. ***We are reporting that Daniel Snyder is nearing an agreement to pay*** ████ ████ ***to Mr. Schar, Mr. Smith and Mr. Rothman for their combined 40% of the Washington Football Team. We are reporting*** ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████ We are reporting that ████████████████████████████████████████████████████ ████████████████████████████████████ ████████████████. The story is sourced to legal documents and filings, and to people aware of the deal-in-progress. Would you or Schar like to comment for this story? If you'd like to speak on the phone, I am happy to discuss this in greater detail.
>
> Please let me know by noon if you plan to comment or if you would like to speak. I appreciate your quick attention to this and do hope we will speak!

Pls.' Mot. Sanctions at 2-3 (emphasis added).

Approximately one hour later on December 18, 2020, at 7:36 am EST, Ken Belson, another reporter with *The New York Times*, emailed Careen Winters at MWWPR, the public relations firm that represents WFI, with a nearly identical request:

> Hi Careen, Happy Friday. We're writing a story about the WFT and the three limited partners (Fred Smith, Dwight Schar and Robert Rothman) who have been trying to sell their combined 40 percent of the team. ***Our story will say that Dan Snyder is nearing an agreement to buy out all three partners.*** ████████ ████████████████████████████████████████████████████ ██████████████████████████████████. ***Also we will include*** ████████ ████████████████████████████████████████████████████

5

██████████████████████████████████████████, something Snyder has alleged in various court documents. Does Dan Snyder have any comment about this potential purchase or the penalties?

Winters Declaration, Ex. A (emphasis added). On December 18, 2020 at 9:33 am EST, Ms. Winters emailed Mr. Belson back: "we will decline to comment." *Id.*

On December 19, 2020, Mr. Belson and Ms. Rosman published an article entitled "Fight for Washington N.F.L. Team Could Tighten Owner's Grip On It" in *The New York Times* ("NYTimes Article"). Winters Declaration, Ex. B. ████████████████████████ ████████████████████████████████ the NYTimes Article detailed the confidential discussions between Mr. Snyder and Plaintiffs. *Id.* at 2. It also reported that Mr. Schar's proceeds might be reduced as a penalty for "trying to publicly undermine Snyder." *Id.* The NYTimes Article cited multiple individuals for this information: "According to *three people* familiar with the plan," "according to *three people* aware of the potential penalties," and "according to *people* with knowledge of the [confidential] negotiations." *Id.* at 1-2 (emphases added).

## DISCUSSION

### A. The Timeline Of Events And Evidence Does Not Demonstrate Disclosure By Defendant

Plaintiffs allege the December 18, 2020 outreach from *The New York Times* to Mr. Koche "mak[es] clear that Defendant Snyder or his agents have disclosed to the New York Times confidential information." Pls.' Mot. at 2. But Plaintiffs, who have a heavy burden of proof in seeking sanctions, do not provide any evidence, much less proof, of this bald accusation. To the contrary, the evidence shows that Mr. Snyder and his agents were not responsible for sharing any such information with *The New York Times*. In fact, Mr. Snyder received a nearly identical outreach from a reporter with *The New York Times* an hour *after* Mr. Koche received a request for comment on the proposed story. *See* Winters Declaration, Ex. A. This sequence of events belies

6

any notion that Mr. Snyder was the source of any leaks.  Mr. Belson was aware of the recited facts *before* he reached out to Ms. Winters, and this outreach occurred *after* Mr. Koche had been contacted for comment.

For Ms. Winters this was the first time she heard of the on-going negotiations.  Winters Declaration ¶ 3.  Ms. Winters responded to Mr. Belson, "we will decline to comment."  Winters Declaration, Ex. A.  She did not speak with or provide additional details to Mr. Belson regarding the confidential negotiations.  Winters Declaration ¶ 4.  Andrew Levander, Mr. Snyder's lawyer leading the confidential negotiations, likewise did not speak, or provide any information, to the press regarding the confidential negotiations.  Levander Declaration ¶ 4.  And Mr. Snyder (unlike Plaintiffs) has confirmed that he did not speak to or directly or indirectly provide information to the press about the negotiations.  Snyder Declaration ¶ 4.

Notwithstanding Plaintiffs' contentions otherwise, the content of the NYTimes Article does not establish that Mr. Snyder or his agents are the source of the leaks.  Plaintiffs claim that coverage of the offer price means Mr. Snyder disclosed this information.  Pls. Supp. Mot. at 1.  But this information was already covered by the press in connection with Mr. Belson previously receiving a copy of Plaintiffs' sealed Complaint in a context evidencing that Plaintiffs, and not Mr. Snyder, were the source of this leak.  *See* Resp. to Emergency Mot. for Protective Orders at 2, 4 (detailing Mr. Belson's previous outreach to Ms. Winters after reading Plaintiffs' sealed Complaint hours after it was filed and shortly after Mr. Snyder's counsel had received it) *and* Resp. to Emergency Mot. for Protective Orders, Ex. 17 (Mr. Belson and Ms. Rosman reporting on November 13, 2020 that Plaintiffs had received an offer to buy their 40% interest in WFI for $900

7

million).[5]  Similarly, information about Mr. Schar's smear campaign and Mary Ellen Blair's involvement therein are now publically detailed in Mr. Snyder's filings in this action, *which Plaintiffs did not seek to keep under seal*.  *See* Opp. to TRO and PI at 4-7.  The press has also extensively covered this information.[6]  Plaintiffs point to the NYTimes Article's coverage of declarations prepared by Mr. Chirite and Ms. Blair as well as the coverage of the 2009 settlement as further evidence of Mr. Snyder's involvement in the article; however, Mr. Snyder is not the only person with access to this information.  In fact, the Blair declaration became public in connection with the defamation suit Mr. Snyder brought in India, *Daniel Snyder Through His SPA Holder vs.*

---

[5] *See also* Factual Background, *supra* at note 2 (███████████████████████████████) and note 3 (███████████████████████████████████████████████████████████████████████████████████).

[6] *See* Ken Belson & Katherine Rosman, *Washington N.F.L. Team Owner Files Claims Hinting At A Conspiracy*, THE NEW YORK TIMES, (Aug. 10, 2020), https://www.nytimes.com/2020/08/10/sports/football/washington-nfl-snyder-lawsuit.html ("In a filing on Monday in Federal District Court in Alexandria, Va., Snyder asked for access to documents that the former employee, Mary-Ellen Blair, who was an executive assistant in the front office, has, including confidential team records, that might bolster his defamation case against an Indian media company that he contends published defamatory rumors about him …. According to the filing on Monday, Blair, starting in late May or early June, started reaching out to current and former team employees seeking information that would discredit the team owner .… The filing also said Blair told a personal employee of Snyder's and two other team employees that "she was in contact with and working in coordination with a third party" and that she and that third party were involved in preparing articles that were going to be damaging to Snyder .…  Snyder contended that she has an unidentified "financial benefactor" who has provided discounted rent in luxury apartment buildings in Virginia that are connected to a minority shareholder who is seeking to sell his stake.") *and* Daniel Kaplan, *'Gangster' Tactics, Burner Phones, Threats: Dan Snyder's Fight With WFT Partners*, THE ATHLETIC, (Dec. 18, 2020), https://theathletic.com/2272033/2020/12/18/gangster-tactics-burner-phones-threats-dan-snyders-fight-with-wft-partners/?redirected=1 ("'On June 26, 2020 plaintiffs instituted the confidential arbitration against Mr. Snyder,' the filing said, referring to the NFL arbitration between the parties that is also underway. 'Shortly thereafter, Mr. Schar initiated contact with Mary Ellen Blair, a former employee and enlisted her assistance in a public smear campaign designed to disparage (Snyder) … Ms. Blair's phone records confirm that Mr. Schar called her on July 5, 2020 and she and Mr. Schar spoke nine times that day. Indeed for the next 45 days she and Mr. Schar spoke at least 63 times and 149 times in July and September 2020.'").

*Eleven Internet Services LLP & Ors.*, filed August 7, 2020 in The High Court of Delhi at New Delhi. *See NFL Team Owner Moves Delhi High Court To Prosecute India-Based Website For Contempt*, INDIA LEGAL (Dec. 15, 2020), https://www.indialegallive.com/constitutional-law-news/courts-news/nfl-team-owner-delhi-high-court-contempt-by-india-website/ (with relevant declaration at page 103 of Mr. Snyder's embedded filing).

Moreover, the NYTimes Article makes clear that the source of this confidential information was from multiple individuals, not from Mr. Snyder. *See* Winters Declaration, Ex. B at 1 (citing "*three people* familiar with" pricing information and the approval process for the confidential negotiations (emphasis added)); *id.* at 2 (citing "*three people* aware of the potential penalties" against Mr. Schar for "trying to publicly undermine Snyder" (emphasis added)). The citation to *three people* clarifies that it was not Mr. Snyder who was the source of this information; however, other parties involved in this dispute may have comprised those *three* people.

As highlighted by Mr. Belson's email to Ms. Winters on the morning of December 18th, there is a history of press leaks in this case, including Mr. Belson's previous, and evidently on-going, access to confidential materials. Mr. Belson's email to Ms. Winters cites ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Winters Declaration, Ex. A. These facts are subject to sealing in this case, including the sealed Complaint, which Mr. Belson had access to within hours of Plaintiffs' filing. *See* Resp. to Emergency Mot. for Protective Orders at 2, 4 (detailing Mr. Belson's previous outreach to Ms. Winters after reading Plaintiffs' sealed Complaint hours after it was filed and shortly after Mr. Snyder's counsel had received it); Resp. to Emergency Mot. for Protective Orders, Ex. 16 (Mr. Belson's November 13, 2020 email to Ms. Winters seeking comment on a forthcoming story and noting it would report: ▮▮▮▮▮▮

9

███████████████████████████████████████████████████ Plaintiffs' central role in historically disclosing information to the press, including through third party intermediaries, is undeniable. Opp. to TRO and PI at 4-5.  . *Id.* at 6-7; Resp. to Emergency Mot. for Protective Orders at 4. Plaintiffs attempt to brush aside their involvement in the on-going negotiations. They are certainly as knowledgeable of the terms and existence of those negotiations, yet they do not submit any declarations affirmatively dispelling their role in the leaks. Their silence speaks volumes.

### B. Defendant Has No Incentive To Risk His Own Deal

Defendant did not initiate this litigation. To the contrary, when a dispute arose over the proposed offer and Mr. Snyder's right of first refusal, Mr. Snyder sought the protection of a confidential arbitration proceeding – not a federal court. And when the NFL intervened to assert the confidentiality provisions it imposes on all owners, Mr. Snyder supported those arguments.

Plaintiffs offer no explanation for why now, with the parties actively negotiating, Mr. Snyder would chose to reveal confidential facts concerning the negotiations. Mr. Snyder withstood months of ███████████████████████████████████████, yet he continually rose above those efforts and repeatedly sought to impose confidentiality obligations on the parties. Now with the prospect of a resolution on the table, Mr. Snyder has no reason to risk his own deal. Indeed, Plaintiffs' baseless suggestion that they have suffered any cognizable harm because of the NYTimes Articles falls flat. The prospect of productive negotiations remains within their control.

### C. The Court's Protective Order Was Not Violated

Putting aside the fact, as affirmed in the Declarations of Mr. Levander, Mr. Snyder and Ms. Winters, that neither Mr. Snyder nor his representatives were responsible for leaking to *The New York Times* any information concerning the confidential negotiations to buy out Plaintiffs' interests

10

in WFI, any such disclosure would not violate this Court's November 19 Order.  The Order the Court issued on November 19, 2020, bars any party from, *inter alia*, "disclos[ing] to any third party any information or document related to the sealed record in this case," November 19 Order ¶ 7, and "interfer[ing] with the rights of any other party relative to this case (e.g., by way of disparagement or otherwise)—more specifically, the right of Plaintiffs to negotiate with the proposed purchasers of Plaintiffs' stock in Washington Football Inc. and to pursue due diligence and the right of Defendant Snyder to claim a right of first refusal to purchase said stock," November 19 Order ¶ 9.  Beyond rushing to this Court to accuse Mr. Snyder of violating the Order, Plaintiffs do not and cannot explain how the alleged disclosure of details of the confidential negotiations (which Mr. Snyder did not leak) would violate either of these provisions.  Plaintiffs' own allegations against Mr. Snyder lack evidence and merit, warranting their own sanctions.  *See* U.S.Dist.Ct.Rules Md. Civil Rule 8(a) ("The Court expects that motions for sanctions will not be filed as a matter of course.  The Court will consider in appropriate cases imposing sanctions upon the parties who file unjustified sanctions motions.").  Without a clear and intentional breach of the Court's November 19 Order (and here there is simply no evidence the leak came from Mr. Snyder), Plaintiffs have failed to establish sanctions are warranted.

Mr. Snyder has not "interfere[d] with the rights" of Plaintiffs, Mr. Snyder has not disparaged the Plaintiffs and he certainly has not "disclose[d] to or use[d] with any third party any information or document related to the sealed record in this case." Pls.' Mot. at 1 (citing November 19 Order).  Sanctions are simply unwarranted here because Mr. Snyder and his agents have not leaked any information; much less violated the Court's November 19 Order.  *See In re Bees*, 562 F.3d 284, 287; 290 (4th Cir. 2009) (reversing district court's imposition of *sua sponte* sanctions where the district court did not "use extra care in imposing *sua sponte* sanctions." (internal citation

and quotation omitted)); *Am. Reliable Ins. Co. v. Stillwell*, 336 F.3d 311, 321 (4th Cir. 2003) (affirming district court's denial of sanctions where defendant's position was reasonable). Indeed Plaintiffs' argument that *sua sponte* sanctions are merited here finds no support in the case law. The cases Plaintiffs cite show that conduct even more egregious than what they allege here still does not merit *sua sponte* sanctions. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 271 (1944) (reversing, without mentioning sanctions, a Circuit Court's finding of patent infringement where an attorney fraudulently published an article that formed the basis of the infringement finding); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 399 (reversing district court's imposition of sanctions where plaintiff filed frivolous defamation claims).

## CONCLUSION

For all the foregoing reasons, Defendant respectfully requests this Court deny Plaintiffs' Emergency Motion Concerning Violation of the Court's November 19, 2020 Order and otherwise decline to enter sanctions against Defendant.

Dated: December 22, 2020

**MILES & STOCKBRIDGE P.C.**

*/s/ Rachel T. McGuckian*
Rachel T. McGuckian
11 N. Washington Street
Suite 700
Rockville, MD 20850
Phone: (301) 517-4816
Fax: (301) 762-0363
rmcguckian@milesstockbridge.com

**DECHERT LLP**

Andrew J. Levander (admitted *pro hac vice*)
Neil A. Steiner (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036

Phone: (212) 698-3500
Fax: (212) 698-3599
andrew.levander@dechert.com
neil.steiner@dechert.com

Christina Guerola Sarchio (admitted *pro hac vice*)
1900 K Street NW
Washington, D.C. 20006
Phone: (202) 261-3300
Fax: (212) 261-3333
christina.sarchio@dechert.com

**TACOPINA, SEIGEL & DEOREO**

Joseph Tacopina  (admitted *pro hac vice*)
275 Madison Avenue
New York, New York 10016
Phone: (212) 227-8877
jtacopina@tacopinalaw.com

*Counsel for Defendant Daniel M. Snyder*