IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **ROBERT ROTHMAN** *et al.*, | * |
| Plaintiffs, | * |
| v. | * Civil No. **20-3290 PJM** |
| **DANIEL SNYDER**, | * |
| Defendant. | * |

## MEMORANDUM OPINION

This case involves the efforts of minority shareholders of a close corporation, who wish to sell their shares to outside parties, to preclude the majority shareholder of the corporation from exercising a right of first refusal (ROFR) to purchase the shares, a right the majority shareholder holds under a Stockholders Agreement with the minority group. The transaction is complicated by the fact that the parties are subject to a broad agreement to privately arbitrate any dispute regarding ownership of the company. The minority shareholders come to federal court seeking varied relief, including an injunction against the majority shareholder from pursuing arbitration of the matter. The majority shareholder, who has filed a separate claim for arbitration according to prescribed procedures, objects to the Court exercising jurisdiction in the matter.

In this Opinion, the Court focuses upon the jurisdictional issue—that is, whether it has authority to hear the dispute presented to it and, if so, what the scope of that jurisdiction might be.[1] The short answer is that, with respect to the matter of Defendant's ROFR, to be described more fully *infra*, the Court concludes that it is obligated to defer to the parties' agreement to arbitrate. That said, the Court holds that it has residual jurisdiction to grant, if called upon, ancillary

---

[1] The Court has diversity jurisdiction under 28 U.S.C. § 1332. Plaintiffs are residents of states other than Maryland, Defendant Snyder is a resident of Maryland, and the amount in controversy exceeds $75,000.

injunctive relief as to certain related issues not currently disputed by the parties, which, in the Court's view, cannot be converted into arbitrable issues simply by Defendant claiming that they are.

The case requires consideration of the fundamental nature of a ROFR, including the extent to which minority shareholders must to be free to search for and negotiate with prospective outside purchasers of their shares without interference or interruption by the holder of the ROFR.

I.

Plaintiffs Robert Rothman, Frederick Smith, and Dwight Schar, nonvoting minority shareholders of Washington Football Inc. (WFI), propose to sell their shares to an outside bidder and have sent Defendant Daniel Snyder, the majority shareholder, a notice of intent to sell, the sufficiency of which Defendant challenges but as to which he has nonetheless attempted to exercise his ROFR to purchase the shares. Defendant's insistence that the dispute must be submitted to arbitration is based not only on the parties' Stockholders Agreement, but also on the Constitution and Bylaws and the Dispute Resolution Procedural Guidelines of the National Football League (NFL), to which the corporation, as holder of the professional football franchise for the metropolitan Washington, D.C., area, belongs.[2]

Plaintiffs specifically ask for a temporary restraining order (TRO), preliminary injunction, and declaratory judgment, all to the end of blocking Defendant from exercising his ROFR.[3] The parties, including the NFL, are currently subject to the Court's order dated November 19, 2020, ECF No. 31, which provides that (1) no action will be taken at present on the Motion for a TRO or Preliminary Injection, ECF No. 9; (2) any arbitration of this matter is stayed pending further

---

[2] The parties agreed at the outset that the NFL should be involved in the case and consented to the organization's motion to intervene, which the Court granted.

[3] Plaintiffs originally filed the entire case under seal, which Defendant agreed to.

order of the Court; (3) the proceedings will in considerable part remain under seal;[4] and (4) Plaintiffs remain able to pursue negotiations with their proposed bidder, with whom they are free to conduct due diligence as to the proposed purchase. As incorporated in the November 19, 2020 order, the parties also agree for themselves and for anyone acting on their behalf that they will observe confidentiality in the suit and that they will not engage in disparagement of one other.

## II.

The close corporation in question is WFI, in which Defendant holds a 40.59% interest, Defendant's mother and sister collectively hold a 19.041% interest, and Plaintiffs collectively hold a 40.499% interest. WFI operates the Washington Football Team, the professional football franchise in the metropolitan Washington, D.C., area, which belongs to the NFL, to which all franchise teams of the league belong. WFI's shareholders have a Stockholders Agreement,[5] one provision of which pertains to the situation where one or more of them wishes to sell his or her shares. The crux of the provision is that, when one or more shareholders wish to sell their shares (in whole or part), the remaining shareholders have a ROFR to purchase the shares.

---

[4] The confidentiality of the proceedings was challenged by the *Washington Post* on the ground that court proceedings are presumptively open to public scrutiny and that there is considerable public interest in the ownership dealings of the owners of Washington's football franchise. After hearing from counsel for the *Post* and consulting with counsel for the parties, the Court promptly advised counsel for the *Post* that there was in fact a proceeding in this Court styled *Rothman v. Snyder*, No. PJM-20-3290, and gave the names and addresses of counsel for the parties. Subsequently, the Court authorized release of a description of the docket entries in the case, though not as of that time, pending further order of the Court, the underlying filings.

The Court thereafter held a virtual hearing on the motion to seal the case, in which counsel for the *Post* and for the parties participated. As a result, the Court held that it was appropriate that substantial portions of the pleadings in the case be made public, save for redactions insofar as they referred to confidential negotiations of the parties (including the third-party bidder) and for certain other reasons. In a separate Order, ECF No. 65, and Supplemental Opinion and Order, ECF No. 69, the Court made specific findings of fact and law relative to the filings that the Court, in whole or part, permitted to remain under seal.

[5] The current agreement is the Second Amended and Restated Stockholders Agreement dated March 31, 2005. *See* ECF No. 9-5.

## III.

The documentary materials are relatively straightforward. The provision of the Stockholders Agreement pertaining to a proposed sale of shares states:

> 7. VOLUNTARY SALE OF STOCK: RIGHTS OF FIRST REFUSAL.
>
> (a) If a Stockholder (a "Selling Stockholder") proposes to effect a Sale of any shares of Stock (other than as permitted by Section 6(c)), then such Selling Stockholder shall give to the Company a written notice (a "Notice of Intention to Sell") setting forth in reasonable detail the terms and conditions of such proposed transaction, including the identity of the proposed purchaser of such shares and enclosing any agreements, draft agreements or letters of intent relating to such proposed Sale. The Company shall deliver such Notice of Intention to Sell to the other Stockholders (the "Other Stockholders") promptly upon receipt thereof.
>
> (b) The following rights of first refusal shall apply with respect to a proposed Sale of Non-Voting Stock by a Non-Voting Stockholder other than (i) a Sale by a Snyder Stockholder, which is governed by the provisions of paragraph (c) below, and (ii) a Sale permitted by Section 6(c)):
>
>> (i) Upon receipt of a Notice of Intention to Sell from the Company, each Other Stockholder shall have the right, exercisable upon written notice to the Selling Stockholder and the Company within fifteen (15) days after receipt by the Other Stockholders of the Selling Stockholder's Notice of Intention to Sell, to elect to purchase all or part of the shares of Non-Voting Stock proposed to be sold by the Selling Stockholder at a purchase price equal to (and on other terms substantially comparable to) that specified in the Notice of Intention to Sell. Such notice shall state the number of shares to be purchased by each Other Stockholder and that such Other Stockholder will purchase such shares within forty-five (45) days after the date of receipt of the Notice of Intention to Sell, or such longer period as may reasonably be necessary to account for the rights to purchase in this paragraph (b) and obtain any required approvals from the NFL or any regulatory authority.

Stockholders Agreement § 7(a)–(b). Section 17(a) of the agreement also contains language providing for arbitration of any disputes over the proposed sale:

> [A]ny controversy or claim between or among the parties hereto including but not limited to those arising out of or relating to this Agreement or any related instruments, agreements or documents, including any claim based on or arising from an alleged tort, shall be determined by binding arbitration in accordance with the Federal Arbitration Act, Title 9 of the United States

> Code (or if not applicable, the applicable state law), the "Comprehensive Arbitration Rules and Procedures" (for claims in excess of $250,000) of JAMS/Endispute or any successor thereof . . . .

The agreement further provides that it is controlled overall by NFL protocols consisting of its Constitution Bylaws, and such, which assert authority over all disputes among franchise shareholders, including with respect to ownership of the franchise:

> Notwithstanding any agreement to the contrary, this Agreement and any and all other arrangements between or among the parties hereto . . . which relates to the ownership or operation of the Franchise as a member club of the NFL, are subject to the Constitution, Bylaws, and other rules and regulations of the NFL (the "NFL Rules") and to the Articles of Association and Bylaws of the NFL Management Council, and certain decision (decisions), rulings, resolutions, actions and other matters as more fully described in Paragraph 1 and other provisions of that certain consent letter of the NFL dated as of the closing of the Acquisition and that certain other consent letter of the NFL executed in connection with the sale of stock to Messrs. Smith, Schar and Rothman.

Stockholders Agreement § 21(a).

The NFL documents expressly provide for arbitration of disputes such as the present one.[6] Article VIII of the NFL Constitution grants the NFL Commissioner "full, complete, and final jurisdiction and authority to arbitrate" a wide range of disputes involving the League, the member clubs, and the owners and employees of the member clubs. NFL Constitution § 8.3, ECF No. 12. That includes "[a]ny dispute involving . . . two or more holders of an ownership interest in a member club of the League, certified to him by any of the disputants." *Id.* § 8.3(A).

The NFL fortifies its insistence on arbitration by emphasizing the all-encompassing nature of its authority to require arbitration of this case.

---

[6] Plaintiffs suggest there is a carve-out to the arbitration agreement if and when they seek "provisional or ancillary injunctive relief." Stockholders Agreement § 17(b). Since, as will be seen, the Court is sending the bulk of the case to arbitration, whether a request for injunctive relief constitutes a carve-out displacing any and all arbitration will be for the arbitrator to decide.

5

## IV.

A few preliminary observations, however, are in order. First, the NFL's claim to comprehensive decision making with respect to "ownership" of the franchise issues is not without ambiguity. Unquestionably, the NFL has authority to ultimately determine who may become a franchise owner and a member of the NFL. But does that right also authorize it or Defendant under the Stockholders Agreement to become involved in the process during which the owners/proposed sellers of shares search for and negotiate with bidders, who at that point are merely prospective owners? Arguably, that preliminary process also pertains to possible "ownership" of the franchise, albeit quite indirectly. More specifically, may Defendant or the NFL formally disapprove of a particular bidder or determine what terms the bid must consist of or disapprove certain proposed terms while the bid is still being formulated? As the Court will address more fully *infra*, there are weighty policy reasons why neither Defendant nor the NFL should be able to intervene in this initial phase of the process. Indeed, this aspect of the ROFR is not really disputed by the parties; both Defendant and the NFL (by entering the case), as reflected in the Court's order of November 19, 2020, have consented to and are bound by the ruling that Plaintiffs' remain free to negotiate with their bidder and that they may, as well, undertake due diligence.

A key question for the Court, therefore, is whether minority shareholders, subject to a ROFR, possess the right to search for and negotiate with a bidder or bidders untrammeled by the possible future exercise of a ROFR and, if so, whether it falls within a category which must be deemed non-arbitrable. The Court holds that there is such a right and that it must be deemed non-arbitrable and subject to protection, if necessary, by appropriate court order.

V.

## A. The Nature of a ROFR

*1. In General*

A ROFR has been defined as "an agreement between the property owner ('grantor') and a holder ('preemptioner') whereby the receipt of an offer from a third-party purchaser to buy the subject property 'triggers' the right of first refusal which, in turn, 'ripens' into an option to buy on part of the preemptioner." *Bramble v. Thomas*, 396 Md. 443, 456, 914 A.2d 136, 143 (2007). Ordinarily, it is a right established by contract, not by substantive law. *See generally* David I. Walker, *Rethinking Rights of First Refusal*, 5 Stan. J.L. Bus. & Fin. 1 (1999). ROFRs have been employed in several settings, often when the interest in question is real estate, but they also frequently are used when the sale of securities is involved. *See id.* at 11. (The Court from this point forward discusses the right in the context of the sales of securities.) Owners of shares who propose to sell their securities to an outsider must first give the holder (or holders) of a ROFR the right to purchase the owner/seller's shares before purchase by the outsider may go forward. *See, e.g., Bramble*, 396 Md. at 456; *see also M & A Motors, Inc. v. Disco Realty, Inc.*, 806 N.Y.S.2d 244 (N.Y. App. Div. 2005). The crucial point is that the holder of the ROFR must be prepared to substantially (if not identically) *match* the bid of the outsider in all relevant particulars. *See Bramble*, 396 Md. at 460. Subject to the setting aside of proposed terms offered in bad faith (e.g., a particular term in the bid slipped in to deliberately poison the exercise of the ROFR, *see id.* at 466–67), an attempted exercise of a ROFR that does not at least substantially match the bid will be ineffective, thus freeing the owner/seller to consummate the contract with the outside bidder. *Id.* at 456–57.

2. *Notice to the Holder of the ROFR*

In order to trigger possible exercise of the ROFR, the contract creating the ROFR invariably requires the owner/seller of the shares to give appropriate notice of the proposed sale to the holder of the ROFR. This can be accomplished by sending a copy of the actual proposed purchase agreement with the bidder to the holder of the ROFR, as well as relevant implementing documents, or it may consist of a written submission detailing the terms and conditions of the proposed sale. *See* Robert K. Wise, Andrew J. Szygenda, & Thomas F. Lillard, *First-Refusal Rights under Texas Law*, 62 Baylor L. Rev. 433, 466–68 (2010). In that way—and really only in that way—will the holder of the ROFR be able to determine whether he is in a position to exercise his ROFR. Typically, there is a time limit within which the holder of the ROFR will be obliged to exercise the right—e.g., 15 days from receipt of the notice—or the right will be lost. *Id.* at 474.

As indicated, if the holder of the ROFR declines to exercise the right or fails to substantially match the proposed sale, the sale to the third party may go forward. If, however, the holder of the right seeks to enforce it, he must then establish his willingness and ability to take up the proposed sale on terms and conditions essentially equivalent to those agreed to by the third party. This is the point at which considerable litigation has taken place. The holder of the ROFR contends that his offer matches the terms of the bidder in all relevant particulars; the owner/seller submits that it does not. Courts then typically step in to resolve the dispute. *See* Wise et al., *supra*, at 474–90.

3. *The Effect of an Arbitration Clause on a ROFR*

Clearly shareholders may agree among themselves that any dispute regarding ownership of the close corporation's shares shall be subject to arbitration, signaling that no court proceeding (except perhaps by way of provisional or ancillary injunctive relief) will take place and that the

dispute will be heard in a private forum. It is equally clear that the arbitration can at least appear to be often all-embracing nature.

There is little doubt that federal courts strongly favor arbitration over litigation. *See, e.g., Se. Stud & Components, Inc. v. Am. Eagle Design Build Studios, LLC*, 588 F.3d 963, 966 (8th Cir. 2009) ("[T]here is a 'strong federal policy in favor of arbitration . . . .'" (quoting *Lewallen v. Green Tree Servicing, LLC*, 487 F.3d 1085, 1090 (8th Cir. 2007))).

The fact remains that certain matters in and of themselves are not properly arbitrable and must remain free of any oversight or adjudication by arbitration, such that a court may be called upon, by way of ancillary injunctive relief if necessary, to preserve that freedom against any interference or interruption either by the holder of the ROFR or, indeed, by the arbitrator. This "right of freedom" to search and negotiate, has special relevance insofar as a ROFR is concerned. The owner/seller of shares subject to the ROFR must be free to search for and negotiate with a prospective buyer (or buyers) in unrestricted fashion, then, via formal notice, present the holder of the ROFR with an essentially complete package for the holder to evaluate in order to determine if he is willing and able to exercise his right. Why should this be so?

It can hardly be maintained that the holder of the ROFR (or an arbitrator) is authorized to participate in and oversee the owner/seller's search for and negotiation with a third-party bidder *before* the complete package of the owner/seller–third party proposal is developed and presented to the holder. Consider: Should the holder or arbitrator be able to intervene from the outset of the search and negotiation process and insist upon knowing who the prospective purchaser or purchasers of the owner/seller's stock might be? Should the holder of the ROFR be able to reject prospective purchasers out of hand so that a bid can never get off the ground? Should the holder be able to disapprove of one or more of the proposed terms of the purchase while they are still

being negotiated—e.g., the sales price, the term of the pay-out, or any other terms and conditions? Indeed, should the holder of the ROFR be able to approach a prospective purchaser and communicate negative information about the owner/seller in order to induce the bidder to withdraw his bid? There are serious policy considerations that underlie, in a related context, the cause of action for wrongful interference with economic expectation. *See generally* Restatement (Third) of Torts, Liability for Economic Harm § 18 (Am. L. Inst. 2020). And, for that matter, from a historical standpoint, courts originally took a dim view of restraints on alienation in the very context of sales of ownership interests in companies. *See, e.g., Victor G. Bloede Co. v. Bloede*, 84 Md 129, 34 A. 1127 (1896); *see also* 1 F. Hodge O' Neal & Robert B. Thompson, *Close Corporations and LLCs: Law and Practice* § 7.17 & n.3 (Rev. 3d ed. 2004).

In keeping with this, should the holder of the ROFR, during the owner/seller's search and negotiation phase, be able to invoke a right of arbitration, with the effect (intentional or unintentional) of interfering with and interrupting with what may be sensitive discussions that the owner/seller and the bidder are engaged in, always of course with the terms of the deal still to be presented as a package to the holder of the ROFR?

In the Court's view, neither the holder of the ROFR nor an arbitrator can have any right of oversight or control over the search and negotiation process *before* the full proposed purchase package is developed and before it is presented to the holder of the ROFR for possible matching. Were this not so, it is difficult to conceive how minority shareholders could ever reasonably undertake to find possible purchasers of their shares.

But while the Court concludes that the owner/seller of minority shares must be free to pursue untrammeled searches and negotiations with their prospective buyer, and that the integrity of this phase of the process must be protected by ancillary injunctive relief if necessary, the holder

of the ROFR, with an essentially complete proposal finally in hand, may very well have to assert a right to arbitration to determine if his response to the bid fairly matches the third party's bid.

How do these considerations factor into the case at hand?

## B. Jurisdiction in the Present Case

As the Court views the case at this juncture, it is not about whether the shareholder parties may have had disputes with each other over corporate decision-making in the past nor about whether Plaintiffs may have waived their right to come to court because in the past they have supposedly sought arbitration of other disputes under the Stockholders Agreement. The critical inquiry at this stage is different: Have Plaintiffs, without interference or interruption, been fully able to search for and negotiate with a prospective third-party purchaser of their shares? Have Plaintiffs given notice to Defendant of a sufficiently complete package of the proposed sale to permit him to intelligently exercise his ROFR? On the other hand, has Defendant possibly intervened in the search and negotiation process too soon, with the result that he has hampered, is hampering, or will hamper Plaintiffs' right to continue their negotiations with the prospective purchasers?[7]

Notably, Plaintiffs and Defendant agree that the notice Plaintiffs gave of their proposed intent to sell is incomplete because several terms and conditions of the proposed sale were not supplied. But if that is so, it would seem that there is no ROFR to be exercised. *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 645 (Tex. 1996) ("Preliminary negotiations between offerors and potential purchasers do not trigger pre-emptive rights."). Unless and until Plaintiffs actually complete negotiations with their prospective bidder, there is no adequate basis for the

---

[7] In their complaint, Plaintiffs allege that "Mr. Snyder's position . . . threatens to disrupt an orderly process—including, among other things, necessary due diligence—for Plaintiffs to proceed to sell their WFI stock." Compl. ¶ 12, ECF No. 1.

holder of ROFR to consider a match. Yet in this case it appears that Defendant has already sought to assert his ROFR and has already given his view of what he believes the contours of his ROFR are. Plaintiffs seem to have presented an incomplete proposed purchase agreement and Defendant seems to have jumped into what should otherwise be an unrestricted, oversight-free process for Plaintiffs and the third-party bidder to negotiate a full agreement. But if indeed the parties need to go back to the drawing board,[8] Plaintiffs will in effect be returning to their prospective bidder to negotiate more complete terms and conditions. At that point Defendant would be obliged to hold his fire and stay out of the process until Plaintiffs are fully prepared to join issue with him.

Once the issue is finally joined, i.e., when Plaintiffs offer a complete package proposal from their bidder and Defendant purports to match it, the Court recognizes that it would be ripe for the arbitrator to decide, assuming of course that the arbitrator, who in this particular case is empowered to determine arbitrability, determines that the matter is in fact arbitrable. But in the meantime, should any inappropriate interference or interruption by Defendant, the NFL, or the arbitrator occur during the owners/sellers' negotiation with the bidder (the interaction of the parties has hardly been without heat or recrimination), the Court will be prepared to grant, if necessary, "ancillary" injunctive relief, as provided in the Stockholders Agreement, to protect the integrity of the search and negotiation process.

Interestingly, this arrangement appears to the Court to be essentially in accord with the concession of both Defendant and the NFL. Both have agreed to and are bound by the Court's order dated November 19, 2020, to permit negotiations and due diligence on the part of Plaintiffs

---

[8] There obviously appears to be no reason why an owner/seller cannot go back to the third-party bidder and reevaluate the terms of their proposed agreement, then return to the holder of the ROFR for further consideration. Nor does it appear that the ROFR is a right exercisable one time only. The owner/seller must be able to seek new and different bidders. At the same time, a ROFR must remain available to respond to any and all bids submitted to him by the owner/seller.

and the bidder to go forward (subject to Defendant's right to object to one or more requests for information pertaining to the bidder's due diligence). Moreover, as a matter of practice, it does not appear that the NFL ordinarily gets into the weeds during searches for and negotiations with prospective franchise purchasers. Its confidential evaluation and decision making come into play when the bidder presents his terms and his credentials, though to be sure, considerable speculation in the media may occur beforehand as to who the bidder might be, what the terms of the bid might be and whether approval of the proposed new owner (in this case the minority share owner) should or should not be granted. *See generally, e.g.*, Will Hobson, *Donald Trump's Long, Stormy and Unrequited Romance with the NFL*, Wash. Post (Sept. 23, 2017).

## VI.

Currently, the parties are in a dust-up over which side may have leaked confidential and negative information about the other to the *New York Times*, resulting in publication. The Court has set a hearing on this matter for early January 2021. But the Court will refer to arbitration the issue of whether and when Plaintiffs have submitted a sufficiently complete good-faith buyout proposal to Defendant and the corresponding issue of the extent to which Defendant has properly engaged his ROFR. In the meantime, the Court will retain jurisdiction to address any further disputes between the parties with respect to possible interference with or interruption by Defendant or the NFL in the process of Plaintiffs' negotiations with their third-party bidder.

A separate Order will be entered.

December 30, 2020

/s/ Peter J. Messitte
PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE

13