



William J. Murphy
PARTNER
Zuckerman Spaeder LLP
wmurphy@zuckerman.com
410 949 1146

January 5, 2021

<u>**VIA ECF – FILED UNDER SEAL**</u>

Hon. Peter J. Messitte
U.S. District Court for the District of Maryland
6500 Cherrywood Lane
Greenbelt, Maryland 20770

   Re: <u>Rothman v. Snyder, No. PJM-20-3290</u>

Dear Judge Messitte:

Along with Joe Reeder of Greenberg Traurig, LLP, I represent nonparty John A. Moag Jr., who has been ordered to appear at a public Zoom hearing at 11:00a on January 7, 2021, to answer certain questions posed by the Court. Mr. Moag will appear as ordered. I write to request that Mr. Reeder and I also be included in the Zoom invitation; to request access to sealed documents relevant to Mr. Moag's testimony[1]; and to provide a corrective response to Mr. Levander's extraordinary letter to the Court dated December 29, 2020, which levels a number of inflammatory allegations at Mr. Moag. (We have seen the December 29 letter, but not Exhibits B-D, as those documents remain under seal.)

We understand that the January 7 hearing is intended to determine whether the parties or their agents provided confidential information to the media in violation of the letter or spirit of the Court's orders. Mr. Moag will categorically deny that he was involved in any such conduct. We do not know whether the Court intends to address Mr. Levander's separate assertions (1) that Mr. Moag filed a declaration in a different matter for the purpose of evading the Court's December 23 order in this proceeding; (2) that Mr. Moag's declaration is "riddled with lies"; or (3) that Mr. Moag "unsuccessfully threaten[ed] Mr. Snyder, through text messages sent to an adviser to Mr. Snyder over the holiday weekend." But because Mr. Levander's accusations are now public, we believe Mr. Moag should have some opportunity to correct the record.

---

[1] In particular, we request that the Court allow Mr. Moag and his counsel to access the sealed exhibits to Mr. Levander's letter of December 29, 2020 (Exhibits B to D), along with those portions of the transcript of the hearing on December 22, 2020, referenced in Mr. Levander's letter, as well as any other materials the Court may want Mr. Moag to address.

1. Neither Mr. Moag nor his counsel was aware of this Court's December 23 order, and Mr. Moag's declaration was intended to show Judge Hollander that Mr. Snyder was seeking overbroad discovery.

Mr. Moag is a business adviser who represents the three plaintiffs in this matter regarding their efforts to sell their minority interest in Washington Football, Inc. (WFI). In that capacity he has had frequent contact with the plaintiffs about WFI and its majority owner, defendant Daniel Snyder, and frequent contact with Mr. Snyder and his advisors. Mr. Snyder has somehow convinced himself that Mr. Moag would act contrary to his own interests and that of his three clients, and contrary to his longtime practice by leaking damaging information about Mr. Snyder to the media. Mr. Snyder evidently comes by this opinion because Mr. Moag has mentioned to Mr. Snyder or his associates that he is privy to certain information that is unfavorable to Mr. Snyder – as Mr. Snyder well knows. But as Mr. Moag repeatedly has tried to explain to Mr. Snyder and his counsel, the information he possesses involves the financial improprieties, discovered well before this suit was filed, that directly affect his clients' interests. Mr. Moag has no personal knowledge about a number of other tawdry allegations that have surfaced about Mr. Snyder; even if he did, he would not leak them to the media. Mr. Moag is trying to close a deal with a buyer who will need to work with Mr. Snyder; he has no business reason to disparage Mr. Snyder in the media.

Nevertheless, Mr. Snyder effectively sued Mr. Moag's company ancillary to a defamation action Mr. Snyder filed in India against certain media outlets that published scandalous information. Mr. Snyder, using this Court's authority under 28 U.S.C. § 1782, sought discovery aimed at finding out whether Mr. Moag was a source of the information published in India. He was not, and he has produced ample information to establish that fact. Mr. Snyder was not satisfied and filed a motion to compel. Magistrate Judge Copperthite granted the motion, and Mr. Moag's company has sought review of the Magistrate Judge's ruling by Judge Hollander. It was in the context of that appeal that Mr. Moag filed a declaration. Declarations were also filed by Mr. Reeder and a member of Mr. Moag's staff. Those declarations detail the efforts undertaken by Mr. Moag, his counsel, and his staff to comply with the requested discovery and also to explain that the statements Mr. Moag made to Mr. Snyder were about *financial* improprieties, having nothing to do with the allegations at issue in the Indian litigation.

Mr. Levander claims that Mr. Moag included information in his declaration that violated this Court's order of December 23, 2020. That assertion is false. In the first place, neither Mr. Moag nor his counsel was aware of the December 23 order when Mr. Moag drafted and filed his December 28, 2020 declaration. Moreover, the statement Mr. Levander references – that Mr. Moag was aware of serious corporate irregularities in the WFI 2019 financial statements – is entirely accurate, but that information did not come to Mr. Moag from the proceedings in this Court or in the arbitration between WFI's majority and minority owners. Mr. Moag came by that information in the course of representing his clients last spring in their attempts to value and sell

their WFI interests. Mr. Moag later learned that an arbitration was filed and that his clients had filed an action in this Court, but once the arbitration began, his clients have *not* kept him apprised of these proceedings.

Mr. Moag's testimony is supported by a separate declaration filed in the § 1782 proceeding by Mr. Reeder, a copy of which is attached hereto as Exhibit 1. As Mr. Reeder explains, he and Mr. Moag needed to show Judge Hollander that some of Mr. Snyder's discovery demands in the § 1782 action actually sought information for use in this action, because they had no relevance to the Indian defamation action. Ex. 1, ¶¶ 2, 6, 12. Mr. Moag had no intention of violating an order of this Court – an order that he did not even know existed until after Mr. Levander filed his December 29 letter.[2] And, as Mr. Neuwirth states in his letter dated December 30, Mr. Moag's declaration says nothing about the "actual subject matter" of this litigation. Mr. Moag takes Mr. Neuwirth at his word since Mr. Moag is not privy to the details of the litigation before this Court.

2.      Mr. Levander's assertion that Mr. Moag's declaration is "riddled with lies" is false and scandalous.

Mr. Levander states that "Mr. Moag's declaration is riddled with lies." The only example he gives is an ostensible disparity between Mr. Moag's testimony that he did not speak to Mary-Ellen Blair on July 7, 2020, and "phone records [that have not been seen by Mr. Moag or his counsel] produced by Ms. Blair documenting a call from her to Moag & Co. on that date." Any moderately careful reader can readily see that those two statements are easily reconcilable: perhaps Ms. Blair called Moag & Co. on July 7, 2020, and did not get through, or did not get through to Mr. Moag. Mr. Moag stands by his sworn testimony that he had never spoken with Ms. Blair before her call to him on August 4. See Moag Decl. ¶ 10. Mr. Moag's testimony in this regard is amply supported by Mr. Reeder's declaration, which states that "Blair's attorney confirmed that she had made it crystal clear to Snyder's lawyers well before they represented otherwise to this court [in the proceedings before Judge Hollander], that no July 7 Blair-Moag communication ever took place." Ex. 1, at ¶ 6. We trust that the Court will scrutinize the relevant phone records and determine for itself whether Mr. Levander's inflammatory allegation was made in good faith.

3.      Mr. Moag made no threats to Mr. Snyder's associates.

Mr. Levander also alleges that Mr. Moag sent a threatening text message to Mr. Snyder's associate over the "holiday weekend," which may be attached to the Levander letter. Because Mr. Moag does not have access to the attachments and is not sure what text is at issue, we

---

[2] Mr. Snyder has now filed a baseless application to hold Mr. Moag's company in contempt, ostensibly for failing to furnish even more discovery than Mr. Snyder's § 1782 petition requested. The contempt application is pending before Judge Hollander, but no order to show cause has yet issued.

respectfully ask that the Court direct Mr. Levander to produce the text message at issue to Mr. Moag's counsel so that Mr. Moag can answer any questions about the message that the Court may have on January 7.

Thank you for your consideration of these matters.

Respectfully submitted,

/s/ *William J. Murphy*

William J. Murphy

Enclosures
  cc:    All counsel of record (by ECF)
          Joe R. Reeder, Esq. (e-mail)
          John J. Connolly, Esq. (e-mail)

# EXHIBIT 1 TO MURPHY LETTER TO JUDGE MESSITTE in Case No. PJM-20-3290

**(Previously filed as ECF No. 31-2 in Case No. 1:20-cv-02705)**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| In Re Application of Daniel Snyder ) | |
| For an Order Directing Discovery from ) | |
| Moag & Co., LLC Pursuant to ) | Case No.   20-CV-02705-ELH |
| 28 U.S.C. § 1782 ) | |

**SWORN DECLARATION IN SUPPORT OF RESPONDENT'S RULE 72 OBJECTION**

I, Joe R. Reeder, declare under penalty of perjury that the following statements are based upon my personal knowledge, and are to the best of my knowledge truthful and accurate:

1.     I am a principal shareholder of the Greenberg Traurig, LLP ("GT") law firm, and submit this Sworn Declaration, my first in this matter, involving the Petition filed by Dan Snyder, under 28 U.S.C. § 1782.

2.     We represent the Baltimore-based company, Moag & Co., LLC, and its principal and CEO, John Moag ("Respondent," or "Moag"), who since 2001, has represented buyers and sellers of major league sports teams, and is well-known for his role in bringing the Baltimore Ravens to Baltimore.  For several years, he has been actively representing first one, then three minority shareholders who own 40% of the Washington Football Team (WFT). As is widely reported throughout the U.S., and almost daily in Washington D.C., these minority owners have been endeavoring to sell their interests in the team, which has led to highly publicized litigation, also in Federal Court in Maryland. The discovery dispute with Petitioner, however, has nothing to do with that litigation which is referenced simply because of the animus Snyder increasingly has shown towards everyone in any way associated with these minority shareholders, and widely reported. (*see* *https://www.nytimes.com/2020/12/19/sports/football/washington-nfl-daniel-snyder.html?searchResultPosition=5*; https://www.washingtonpost.com/sports/2020/12/19/dan-snyder-minority-owners-feud/;   https://www.washingtonpost.com/sports/2020/12/23/during-

daniel-snyders-ruinous-reign-theres-always-another-shoe-ready-drop/)  This sworn Declaration accompanies Respondent's Rule 72 Objection to the Magistrate's Order of December 17, 2020, and Respondent's supporting Proposed Order as well. Declarant regrets not being able to resolve this dispute over discovery without need for judicial relief, but what's happened thus far confirms that this Court, in justly resolving the proper bounds of any continuing Section 1782 discovery, should have knowledge of (a) Moag's efforts to respond to Petitioner's discovery, which, by day's end, Monday, December 28, 2020, will total four separate waves of production. The Court also should be generally aware of (b) the ongoing flood of adverse publicity about Petitioner Snyder that has nothing to do with the Indian Action and this Court's grant of 28 U.S.C. § 1782 discovery so that it knows that the Indian Action allegations are but the tip of the iceberg of adverse Snyder publicity.  And, finally, to understand why Snyder would seek discovery of adverse publicity completely unrelated to the Indian Action at issue here, the Court should know of (c) the increasingly bitter litigation recently filed by Moag's clients against Snyder in Judge Messitte's court, which has nothing even remotely to do with the Indian Action or its allegations. While Petitioner's desire to leverage this §1782 process to also gain discovery useful in other litigations might be understandable, allowing such discovery would abuse what the Court here sought to facilitate.

3.     At the heart of Moag's right to Rule 72 relief is the absence of any ruling on Respondent's 5-page Objections to discovery, which, after scores of hours attempting to accommodate Petitioner's discovery, were timely served on November 9, 2020.  The December 17 Order neither rules on nor mentions Moag's objections, which can be found in Petitioner's certified LR 104.7 filing at ECF 12-1, pp 121. Petitioner has not challenged Moag's objections.

4.     At the beginning, on September 16, 2020, John Moag called me saying he needed help, having received press inquiries and reading press reports that Dan Snyder had "sued" him.

2

We quickly checked the Court's docket entries, and my assistant, Evonne Mobley, tried to obtain the Petition, but this was declined by the Court clerk. This obviously meant no one other than the filing party (Snyder) controlled access to the press or anyone else. The Court's docket page initially reflected that Snyder had filed "pro se," [*see* Exh. A hereto], so I told Moag that he could properly contact Snyder directly, which he did. During this time period, Petitioner's counsel surfaced, and expressed surprise about the docket reflecting "pro se."

5.      Since that time, and contrary to Petitioner's 128-page Motion and Reply memoranda, Respondent's efforts to comply with Petitioner's discovery were and continue to be extensive, made in good faith, and exceed what the rules require.  As Moag's objections memorialized regarding the initial Request 1, we believed then and continue to believe that the parties had agreed to restrict the "Snyder-referencing" documents so as to exclude all documents that dealt solely with business issues germane to the minority owners, and documents otherwise having nothing to do with or any conceivable relationship to the Indian Action, which concerns two sensational allegations—one connecting Snyder to convicted felon Jeff Epstein, and the other connecting him to sex trafficking.  Mr. Moag from the outset, through me, offered to the Snyder's lawyers to sign any sworn statement Petitioner might want to draft confirming to their satisfaction Moag's total lack of involvement and/or knowledge concerning any aspect of the sourcing of either of those allegations. Moag's sworn Declaration is now on file to this effect. Believing the parties had agreed to limit discovery to the Indian Action, at Petitioner's request, Moag in good faith spoke directly with Snyder. Also at the Snyder lawyers' request, Moag and I each spoke with Snyder's close confidante, Greg Owen.  While not required by discovery obligations, we did this because Moag had nothing to hide, and we believed at the time that once the Snyder team was satisfied that this was true, that discovery would be concluded.

3

6.      Paragraph 9 of the December 17, 2020 order refers to Petitioner's alleged "communications between Respondent and persons named in the Proposed Order." Petitioner identified eight persons/entities other than Snyder subject to discovery. As the Moag Declaration confirms, Mr. Moag has never communicated with the six India-related named persons/entities or anyone connected even remotely to any of them. Nor did he know they existed until the July 16 publication. As to the seventh person, Mary Ellen Blair, which Petitioner references 44 times in its Motion papers, contrary to the Qureshi sworn declaration (ECF 13-3 ¶¶ 7 & 8), and Petitioner's Memorandum in Support of his Motion to Compel, EFC 13, page 9, Mr. Moag never heard of Mary Ellen Blair before August 2020, making Snyder's tortured representations regarding a Blair-Moag communication on July 7 false. More serious, speaking directly with Blair's attorney in Chicago, I have confirmed that the Snyder lawyers knew this, before falsely representing otherwise to this Court, under oath. (*See* Qureshi Decl. at ¶7). Specifically, Blair's attorney confirmed that she had made it crystal clear to Snyder's lawyers well before they represented otherwise to this court, that no July 7 Blair-Moag communication ever took place. So Petitioner's lawyers knew this when they cried foul in their pleadings, simply because I asked for specifics as to the time, or duration which might help explain what was being mistaken for a call that never took place. Mary Ellen Blair is a red herring. Snyder has neither sued, nor even deposed this former Snyder employee, and, while her relationship with one of the minority owners in litigation has incurred Snyder's apparent wrath, Moag had no contact with Mary Ellen Blair with respect to any aspect of the Indian Action, and no contact with her in July of 2020. Similarly, as to the eighth and final Snyder search term, a person named Bobby Potter, cited 29 times to this Court in Petitioner's effort to connect Potter with the Indian Action, as the Moag Declaration explains (Exh. 1 at ¶ 12), Potter and Moag never knew each other before July 7, when Potter called Moag saying he had potential buyers for the Washington Football team. So that this Court knows, Potter

4

has never been sued, deposed or even questioned by Snyder's team, which obviously would not be the case if the Snyder team suspected that Potter had any relationship with Snyder or the Indian Action allegations.

7.      Respondent has no desire to litigate the integrity of opposing counsel, but that door has been opened, and obviously requires a response, with specifics. The last sentence of Paragraph 7 of the Qureshi Declaration filed twice with this court (*see* Exh. 3 to ECF 5 & ECF 13), falsely states: "I [Qureshi] sent a follow-up email at 4:52 PM asking whether Mr. Reeder would produce "all phone records during the relevant period showing communications between your client and Ms. Blair," <u>to which he has failed to respond.</u>" (Emphasis added.)

8.      If this were true, the Court obviously would see this as uncooperative. But it was false, and Qureshi and his colleagues knew this statement was false when they filed their 128-page Motion to Compel (*see* ECF 5, Exh. 3) first on Veteran's Day evening, November 11, at 6:59 pm, and again later, on December 12, 2020 (ECF 13, Exh. 3). The truth is that I responded by email to Qureshi on November 11, 2020, at about 6:20 p.m. (*see* Exh. B, hereto). This short email not only was responsive; it also reconfirmed that the rolling discovery was continuing, the next day, November 12. And, based upon confirmation receipts emailed back to me, Snyder attorney Qureshi and at least one other of his colleagues within minutes opened and read my email. But wanting to claim my email didn't exist because it destroyed Snyder's false narrative of "bad faith," while understandable, doesn't make it right. The Snyder lawyers obviously knew what they were doing, and how the Court would react.  The extent to which this repeated misstatement may have led the Magistrate to view Moag as uncooperative we do not know, but it could well have contributed to overlooking the fact that the initial 13-page production had been twice supplemented with an additional 109 pages as of the December 17 date of the Order.

9.       The § 1782 process was intended to assist the Indian Action. Indisputable abuse of process by Snyder to date, including press leaks of what Snyder knew would be an *ex parte* filing concealed from Moag, a pleading Petitioner has urged this Court to file "under seal," and demands extending well beyond the Indian Action, have caused Moag serious injury, which warrants judicial oversight, and relief if this persists. The Moag Declaration, (Exh. 1 ¶¶ 3,4 & 8) describes the Snyder "leak to the press" strategy confirmed by a news story on September 15, 2020, quoting directly from Paragraph 31 of the Snyder Petition (*see* https://frontofficesports.com/sports-investment-firm-latest-target-of-dan-snyders-legal-team/).   Other news outlets also were provided copies and ran stories quoting from the Snyder petition, much of it well before the Court docketed entry of the Petition, and two months before Moag received a copy.  Both orally, and in writing, I have asked the Snyder lawyers to explain this.  They have ignored those requests.  This Court accommodated Petitioner's request to (a) grant the Snyder petition, (b) under seal, and (c) *ex parte*. The Court surely deserves an explanation, given both the Court's accommodation to Petitioner here and the serious injury to John Moag, who over the decades has earned and enjoys an impeccable reputation for avoiding the press, and keeping himself and clients out of the limelight—attributes critically essential in his business. Discovery requests, as the Court well knows, are rarely newsworthy, unless, as here, they've been made newsworthy for reasons, *i.e.*, "press," rather than legitimate discovery. Here, and even more basic, *ex parte* filings, which are also put under seal should <u>never</u> be leaked to the press. Whether to generate press, or in hopes of causing an unknowing Court to issue a discovery hunting license well beyond the Indian Action allegations, this Court's informed governance is warranted. Given the record here as to how Petitioner has exercised the authority accorded him by this Court, John Moag deserves judicial policing of this matter, going forward.

10.     The December 17, 2020 Order (¶ 7), without ruling on or otherwise mentioning Moag's timely objections, noted that while Parties exchanged protective order drafts (*see* Decl. ¶ 15, below), Moag did not file for a protective order.  Without knowing how Moag's objections would be ruled upon, it was impossible to know what needed protection, or how to accurately tailor a Motion for a Protective Order. From the outset, and lulled by Petitioner's coaxings to the effect that Snyder would work with reasonable discovery boundaries limited to the Section 1782 Petition on the Indian Action, we did a number of things to prove what essentially was a negative: Moag personally spoke directly with Petitioner and also (at Petitioner's request) with Snyder's personal confidante, Greg Owen, with whom I also spoke at some length. We offered to provide sworn affidavits as worded by Snyder counsel that would satisfy Petitioner that John Moag knew nothing about, and had no even remote connection to any aspect of the Indian Action. We also told the Snyder team we hoped they find the source of the Indian allegations (if there is a source other than the dubious Indian publication, itself).  Under these circumstances, no reason existed for Moag to request a protective order.

11.     The third paragraph of the December 17, 2020 Order notes that Moag produced only 13 pages of documents. Petitioner knew this is what the Court might believe, reading the November 11, 2020 Snyder lawyer Declaration.  At the time that Declaration was signed, in fact, the second of what is now four rolling productions had occurred, so the number then was 14 pages, including an email notifying NFL's general counsel of two Snyder-hired intruders (*see* Moag Decl. at ¶¶ 10 & 11). And as a review of Petitioner's now 517-page December 12, 2020 filings would have confirmed (*see* ECF 12 & 13), by this date, and with Respondent's third production (on December 2, 2020), the documents Moag had provided numbered 122, marked MOAG000001-MOAG000122).

12.     The December 17, 2020 Order (¶ 4) concludes that the India court is "out of the reach of the parties to this action," and later (¶ 8), concludes that the courts of India will decide on "admissibility of evidence."  Respectfully, Petitioner and his counsel are very much within reach of the India Court and Snyder's lawyers in India. Otherwise, there would be no reason for this 28 U.S.C. § 1782 proceeding.  More basic, "admissibility" assumes evidence is produced to the Indian courts. While perhaps interesting to newspaper and gossip columns wholly unrelated to the India allegations, as his sworn affidavit confirms, nothing John Moag has produced, or could produce, has any remote bearing on anything even ephemerally relevant to any parties' claim or defense in the India Action.  Indeed, from conversations with counsel defending other of the countless § 1782 petitions Snyder has filed throughout the U.S. against former Snyder employees and others, it is becoming increasingly clear that John Moag is but one of many § 1782 Snyder recipients who knew nothing before July 16, 2020, about the shocking India allegations.

13.     The December 17, 2020 Order (¶ 5), notes negotiation efforts that I initiated as to protective order terms, and by adopting Petitioner's representations, concludes that these efforts ended when I proposed "a new wrinkle." The context was actually very different. The records at issue were telephone records (number, date, duration) that phone companies may provide upon request for a certain limited time. What the Snyder team wanted to do, rather than take Mr. Moag's word, was to rummage through every one of these many hundreds of calls, without limitation, which was far beyond the Snyder discovery request. Moag, who has nothing to hide, was willing to do this, provided it resolved matters, and was done under a protective order. Among other things, that would have allowed Petitioner to confirm from the many hundreds of calls, first, that Petitioner's insistence that a Blair-Moag communication occurred on July 7, 2020 was false, and second, that my assistant, Evonne Mobley, inadvertently had missed the one Potter entry of 5 minutes on July 30, 2020—which is provided in Moag's December 28, 2020 fourth production,

as REVISED MOAG000075. Other than Blair and Potter, Snyder has provided no other phone numbers to search. I provided a draft protective order, accepted all of the Snyder redlined changes, and we then agreed on advance notice if this voluntary disclosure led the Snyder team to pursue a Moag contact, some being public figures. After Snyder's counsel emailed agreement to advance notice, (Exh. C hereto), I asked that the agreed advance notice be five days, which was rejected, with no alternative advance notice provided by the Snyder team. Falling in the category of no good deed goes unpunished, that is the true context, or "wrinkle," that ended this effort to go above, and beyond.

14.     Moag's fourth production consists of additional documents that were retrieved Christmas week with the help of outside technical assistance (*see* Moag Decl. ¶ 14). As the Moag Declaration confirms, as of this filing, and at the time of each of the four rolling productions, Moag, to the best of his ability, has responded to Petitioner's discovery. Again, nothing produced or producible even remotely connects Moag to the Indian allegations, or to any evidence that would assist that foreign litigation's discovery needs.

15.     Petitioner's Motion also distorts the record in other respects. It confuses what originally was called for in the subpoena, and Parties' subsequent agreements to modify same. And it selectively describes aspects of the Parties' (at least Moag's) extensive efforts to collaborate by leaving out those details and agreements that don't fit Petitioner's false narrative of "bad faith." Third, and perhaps most serious, in trying to convince the Court of its narrative, Petitioner actually fabricated other facts it knew were untrue, as explained above in paragraphs 9 & 10.

16.     From the beginning, as now set forth in his Declaration, Petitioner was told that Moag (a) was stunned reading those world-wide published allegations for the first time on and after July 16, 2020, (b) knew nothing about the sourcing of that information, and (c) would sign

any statement under oath to that effect, as worded by Petitioner. Petitioner may be frustrated with Respondent's lack of involvement, but accusing Moag of "bad faith" based on "meager" discovery production is neither logical, reasonable, nor just. Fundamental is the reality here that, insofar as any connection between John Moag and the Indian Action, as Mr. Moag is confirming under oath, and as this now unduly exhaustive search bears out, there is no "there, there." To the extent provable, the "negative" to be established here, is inescapable—Moag has no knowledge of how the tawdry Indian Action allegations originated, and no credible factual basis has or can be produced to conclude otherwise.

17.      Respondent's extensive efforts to date mistakenly assumed, based on repeated assurances from the Snyder lawyers, that once satisfied he had no information about the Indian allegations, discovery with Mr. Moag would be done. Courts have little patience for disputes that should and could have been resolved among counsel, and we as Moag's counsel, as all lawyers should do, have worked diligently to satisfy the Snyder side that Moag is telling the truth about this negative.  Not then knowing Petitioner's "scorched earth" approach with all who incur Snyder's wrath, most particularly anyone Snyder now associates with the minority owners, we naively assumed Petitioner's interest tracked Rule 1 of the Federal Rules of Civil Procedure, which calls for "just, speedy and inexpensive determination of every action and proceeding." Sadly, we were wrong, and, absent closure of this process, Mr. Moag both needs and deserves judicial oversight.

18.      Petitioner's papers seriously distort the truth. His Memorandum in Support of his Motion to Compel (p. 5) notes that as of Petitioner's November 11, 2020 Motion, Moag's initial two productions were "meager," which, instead of recognizing that this further documented Moag's complete lack of knowledge of or involvement with the Indian Action, he characterizes as "bad faith." And in his zeal (as the Magistrate noted) to flag out of our many constructive

conversations the two conversations that got heated on both sides (which I regret), Petitioner's counsel chose not to provide the Court with the details of his repeated assurances to me, to the effect that "we will work with you, on schedules, and limiting discovery, and rolling production," and that he understood and accepted that many business-related communications that might allude to Snyder were completely unrelated to the Indian Action, and were not needed or sought. He also conveyed that he had "no problems" with delays caused by COVID-distanced staff who needed to return back into the office to help us to prove the negative here at issue.  While it should be clear that Petitioner's lawyers speak from both sides of their mouths, the Court deserves the truth.

Joe R. Reeder
USDC MD#06701
Greenberg Traurig, LLP
2101 L Street N.W.
Washington, D.C. 20037
(202) 331-3100
reederj@gtlaw.com
*Attorney for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of December 2020, I caused a copy of this foregoing to be sent by first class mail and electronic mail to the following counsel for Petitioner.

Rizwan (Rizzy) Qureshi, Esq.
rqureshi@reedsmith.com
Reed Smith LLP
1301 K Street, N.W.
Suite 1000 – East Tower
Washington, D.C. 20005-3373

/s Joe R. Reeder
Joe R. Reeder

11

# EXHIBIT A

# U.S. District Court
## District of Maryland (Baltimore)
## CIVIL DOCKET FOR CASE #: 1:20−mc−00476

Snyder v. Moag & Co., LLC                                    Date Filed: 09/15/2020
Assigned to:

**Petitioner**

**Daniel Snyder**                          represented by   **Daniel Snyder**
                                                            PRO SE

V.

**Respondent**

**Moag & Co., LLC**

# Proceedings for case 1:20−mc−00476 are not available

# EXHIBIT B

**From:** Reeder, Joe (Shld-DC-LT)
**Sent:** Wednesday, November 11, 2020 6:20 PM
**To:** Qureshi, Rizwan A. <RQureshi@reedsmith.com>
**Cc:** Pusateri, Michael (OfCnl-DC-LT) <pusaterim@gtlaw.com>; BDavidson@reedsmith.com; Mobley, Evonne (ExecAsst-DC-LT) <mobleye@gtlaw.com>
**Subject:** Your Client Dan Snyder's Discovery, and Your Search Term "Blair"
**Importance:** High

Rizzy,

Happy Veterans Day. Sorry I couldn't discuss more with you last evening; as I explained, I was racing home late hosting an event with Gen. HR McMaster.  Like me, John's never seen his phone records, and has asked his secretary to come in tomorrow to help him try to retrieve, so we should be able to supplement tomorrow. Questions, call in the morning; numbers all forwarded as we've stopped going in for a while hoping the COVID dies down. Thanks, JR

# EXHIBIT C

**From:** Reeder, Joe (Shld-DC-LT)
**Sent:** Tuesday, December 1, 2020 9:50 AM
**To:** Qureshi, Rizwan A. <RQureshi@reedsmith.com>
**Cc:** Mobley, Evonne (ExecAsst-DC-LT) <mobleye@gtlaw.com>; Davidson, Brittany M. <BDavidson@reedsmith.com>; Schoenberg, Pamela L. <PSchoenberg@ReedSmith.com>; Pusateri, Michael (OfCnl-DC-LT) <pusaterim@gtlaw.com>
**Subject:** Draft Confidentiality Agreement

Thanks, Rizzy. I'll modify the draft accordingly, transmit for your signature, and proceed with supplementing our prior production.  Joe

**From:** Qureshi, Rizwan A. <RQureshi@reedsmith.com>
**Sent:** Monday, November 30, 2020 11:20 PM
**To:** Schoenberg, Pamela L. <PSchoenberg@ReedSmith.com>; Pusateri, Michael (OfCnl-DC-LT) <pusaterim@gtlaw.com>; Reeder, Joe (Shld-DC-LT) <REEDERJ@gtlaw.com>
**Cc:** Mobley, Evonne (ExecAsst-DC-LT) <mobleye@gtlaw.com>; Davidson, Brittany M. <BDavidson@reedsmith.com>; Qureshi, Rizwan A. <RQureshi@reedsmith.com>
**Subject:** RE: Draft Confidentiality Agreement

Joe,

As discussed, I write to confirm that we have no objection to providing you notice in advance of using the discovery materials pursuant to the protective order.

Thanks,
Rizzy